**UNITED STATES of America,
Appellee,**

**v.**

**Robert EDWARDS, Max Jakob, John J. Lombardozzi and Milton Parness,
Appellants.**

**No. 441, Docket 30345.**

United States Court of Appeals
Second Circuit.

Argued June 20, 1966.

Decided Sept. 12, 1966.

---

854

Edward S. Friedland, New York City, for appellant Robert Edwards.

Stuart A. Jackson, New York City (Royall, Koegel & Rogers, Norman Ostrow, Guy C. Quinlan, New York City, on the brief), for appellant Max Jakob.

Eugene Feldman, New York City (Jaffe & Feldman, Anne Gross Feldman, New York City, on the brief), for appellant John J. Lombardozzi.

Meredith Hemphill, Jr., New York City (Anthony F. Mara, New York City, on the brief), for appellant Milton Parness.

Otto G. Obermaier, Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty. for Southern Dist. of New York, Michael W. Mitchell, John E. Sprizzo, Asst. U. S. Attys., on the brief), for appellee.

Before WATERMAN, MOORE and KAUFMAN, Circuit Judges.

KAUFMAN, Circuit Judge.

Robert Edwards,[1] Max Jakob, John Lombardozzi and Milton Parness appeal from their convictions for violating the National Stolen Property Act, 18 U.S.C. § 2314, and conspiracy to violate 18 U.S.C. §§ 2314, 2315 (18 U.S.C. § 371). After a three and one-half week trial before Judge Wyatt and a jury, sentences were imposed ranging from imprisonment for one year and one day to

1. On May 19, 1966, Edwards' appeal was dismissed for failure to file his brief and appendix in accordance with the schedule previously set down by this court. On June 20, 1966, Edwards moved to vacate the dismissal, citing unusual circumstances which prevented his attorney from devot-

ing his time to this case. Because of these circumstances, we vacated the dismissal of Edwards' appeal, accepted a belatedly filed brief (to which the government has responded) and considered Edwards' appeal on the merits.

four years.[2] For the reasons set forth below, we affirm.

The indictment, filed on July 1, 1964, was in four counts. Count one charged 16 defendants, including the 4 appellants,[3] and 6 co-conspirators not named as defendants[4] with participation in a conspiracy which encompassed the transportation in interstate and foreign commerce of approximately $1,000,000. in securities stolen from Bache & Co. (Bache), a New York brokerage concern. Count two charged appellants and several other co-defendants with the substantive violation, 18 U.S.C. § 2314, of transporting stolen securities from New York City to Newark, New Jersey. Counts three and four charged other substantive violations of 18 U.S.C. § 2314 involving transportation of stolen securities from New York City to Miami, Florida and from New York City to Denver, Colorado but, prior to and at trial, these counts were dismissed on the government's motion.[5]

■ Much of the government's case rested on the testimony of defendants Dodge, Pomeranz, Sessler, Gladstone and Markowitz[6] who testified in its behalf. Viewing, as we must on appeal, all the evidence presented and the reasonable inferences flowing therefrom in the light most favorable to the government, United States v. Kahn, 366 F.2d 259 (2d Cir. 1966); United States v. Robbins, 340 F.2d 684 (2d Cir. 1965); United States v. Kahaner, 317 F.2d 459, 467 (2d Cir.),

cert. denied, 375 U.S. 836, 84 S.Ct. 74, 11 L.Ed.2d 65 (1963), a mosaic of cunning and nefarious crime emerges. In order to avoid obfuscating the rather involved facts, it is useful before presenting a detailed review of the evidence, to summarize the government's case and to outline in skeleton form the manner in which the alleged conspiracy operated and the way in which each appellant was implicated in the substantive and conspiracy counts.

The first link in the alleged conspiracy chain was Gordon Tallman, an employee of Bache, who, over a period of time, stole approximately $1,000,000 of "blue-chip" securities registered in the firm's name and turned them over to Robert Dodge for distribution and ultimate sale. Dodge passed these securities to Alan Pomeranz who, in turn, gave them to Robert Edwards. During June and July 1962, Edwards distributed various quantities of the stock to Milton Parness who brought Fred Sessler and Sheldon Lowe into the scheme hoping to utilize their brokerage connections. However, they thought it advisable to deal with Max Jakob, who also was familiar with the disposition of stock and who was in need of funds for his ailing enterprise. Jakob turned for aid to William Gladstone, his business associate and attorney, who obtained assistance from his law partner, Bert Markowitz.

Devising a plan which required a so-called "small man" and "big man" to

2. Edwards was sentenced to four years of imprisonment on counts one and two, the sentences to run concurrently. Jakob received concurrent sentences of one year and one day on counts one and two, and a $10,000 committed and consecutive fine on each count. Lombardozzi and Parness were each sentenced to four years of imprisonment on counts one and two, the sentences to run concurrently with each other, but consecutively to sentences then being served.

3. Named as defendants were Robert J. Dodge, Alan J. Pomeranz, Robert Edwards, Leo I. Sagal, Milton Parness, Joseph G. Martinelli, Martin L. Carbone, Fred F. Sessler, Sheldon Lowe, Max Jakob, William B. Gladstone, Bert Markowitz,

John J. Lombardozzi, Michael Lekacos, Michael Levas, John Doe, a/k/a Robert Francine.

4. Named as co-conspirators but not as defendants were Francine Pomeranz, Gordon A. Tallman, Alan L. Fisher, Francis P. O'Neill, Isidore Gorlitsky and Benjamin Clott.

5. Only the four appellants and three co-defendants, Martin L. Carbone, Sheldon Lowe and Leo I. Sagal were tried together. Sagal pleaded guilty to count one at trial. Carbone's appeal was dismissed on May 11, 1966 and Lowe did not file a notice of appeal.

6. These defendants pleaded guilty to the conspiracy count of the indictment.

dispose of the stock, Gladstone obtained approximately $60,000 of Bache purloined stock which had been passed down the line from Tallman to Jakob. Gladstone turned these securities over to Benjamin (Buddy) Clott, the "small man," who attempted to sell them, with the aid of Isidore Gorlitsky, through the brokerage facilities of Kesselman & Co. Gorlitsky was arrested, however, on July 2, 1962, after the certificates which he had presented were identified as missing from Bache.

Gladstone also utilized the services of John Lombardozzi, his "big man," to distribute the stock. Lombardozzi's attempt, with the aid of an unidentified and unapprehended co-defendant, "Robert Francine," to sell other purloined Bache securities through the brokerage houses of L. P. Denenberg & Co. and S. P. Levine & Co. failed on July 9 when it was discovered that Bache had impaired the negotiability of the stock through the use of stop orders.

Despite these events, however, arrangements were made to transact a sale of a large portion of the stolen stock on July 20 at the Robert Treat Hotel in Newark, New Jersey. The prospective purchaser was secured by Clott and identified as a buyer from the West Coast. Actually, he was an agent of the Federal Bureau of Investigation acting under cover. The attempted sale in the New Jersey hotel led to the apprehension of the participants in the scheme and its eventual termination.

Because appellants vigorously challenge the sufficiency of the evidence underlying their convictions, we proceed to expand and present in greater detail the involved and complex and sometimes confusing facts.

The seeds of the alleged conspiracy were sown in November 1961 when defendant Gordon Tallman met defendant Robert Dodge in the "Tap Room" of the Hotel Taft. In the course of their conversation, Tallman informed Dodge that he had access to the vault of his employer—a Wall Street brokerage house [7]—and could obtain for disposal undetected, virtually any amount of negotiable securities he desired.

But, this meeting did not bear fruit immediately. It was not until April 1962 when Dodge met Tallman and co-conspirator, Francine Pomeranz,[8] that Mrs. Pomeranz suggested that Tallman steal some stock which Dodge could hypothecate for their mutual profit. After waiting for Bache auditors to complete a periodic audit, Tallman, approximately ten days later, appropriated a certificate representing 100 shares of General Motors stock registered in the name of one "Smythe" and turned it over to Dodge. But, this prologue to the alleged conspiracy ended in failure. Dodge was unable to negotiate the stock by using it as collateral for a loan because he did not have proper identification; ultimately, Dodge burned the certificate.

Undeterred by this initial lack of success, Francine suggested that her husband, defendant Alan Pomeranz, was able to distribute stolen stock. It was agreed that Dodge would act as a "middle-man" so that Tallman and Pomeranz could avoid dealing directly with one another.

In the latter part of May 1962, Pomeranz encountered appellant Robert Edwards outside the Stage Delicatessen, a restaurant in Manhattan, and asked Edwards if he would be interested in participating in the disposal of some stolen securities. After learning that as much as $200,000 to $500,000 worth of certificates might be involved, Edwards counseled that it was imprudent to continue the conversation on a public street and suggested that Pomeranz contact him in a few days.

Accordingly, in late May or early June, Pomeranz called Edwards and was invited to the latter's Central Park West apartment. Edwards told Pomeranz he was interested in the proposed transaction and they proceeded to discuss its additional aspects. Indeed, Edwards stated

---

7. At this meeting, Tallman did not mention Bache & Co. by name.

8. Francine Pomeranz was separated from her husband, defendant Alan Pomeranz.

that he had already contacted someone in connection with the deal. Edwards went on to suggest that certificates registered in a street name be obtained, and Pomeranz observed that since the stock was to be acquired from a New York brokerage house, it would be advisable to dispose of the stock away from New York. Edwards and Pomeranz also agreed to "make it a one-shot deal and take as much as [they] could get." Estimating that they could realize 15%–20% of face value, they decided to obtain $1,000,000 worth of "blue-chip" securities; to make detection of their plan difficult, they agreed not to disclose their respective contacts to one another.

Meanwhile and during this same period, appellant Milton Parness met defendant Fred Sessler at the Debonair Restaurant in Manhattan and discussed the possibility of employing Sessler's brokerage firm, Fred F. Sessler & Co., to dispose of the stolen securities. After speaking to his partner, defendant Sheldon Lowe, however, Sessler advised Parness that his firm was inadequate for the task and suggested that arrangements with appellant Max Jakob could be made. Sessler also noted that stolen securities registered in a "street name" as distinguished from an individual's name would be readily negotiable.[9]

The day following his meeting with Edwards, Pomeranz phoned Tallman and described the "one-shot" nature of the proposed transaction. Tallman indicated that he would have no difficulty appropriating $1,000,000 of stock registered in a street name and was willing to accept 5% of the face value of the securities as his fee. When Tallman inquired as to whether "front money"—a deposit —would be forthcoming, Pomeranz noted that he assumed so but that the matter had not yet been determined.

At a subsequent meeting in Edwards' apartment, Edwards told Pomeranz that he had to be sure the stock was not counterfeit and, therefore, he and his contacts wanted to examine a sample. Accordingly, Pomeranz spoke to his wife, directed her to tell Dodge to obtain a sample and added that, when Dodge was ready, he would meet him at the Mermaid Room of the Park Sheraton Hotel. Mrs. Pomeranz stated that Dodge would be wearing one of Pomeranz' suits to facilitate identification since Dodge and Pomeranz did not know one another.

The following day, June 5, Tallman met Dodge at the Coachman Bar on William Street in Manhattan and gave him an envelope containing a single certificate representing 100 shares of General Motors stock registered in the street name of Bache & Co. According to plan, Dodge proceeded to the Mermaid Room of the Park Sheraton Hotel and met with Pomeranz who was seated at the bar. After a few minutes, Pomeranz walked to the men's room and Dodge followed shortly. There, Dodge handed Pomeranz the envelope containing the certificate of 100 shares of General Motors stock which Tallman had earlier appropriated and given him. When Dodge inquired about front money, Pomeranz responded that he did not know if any would be forthcoming. Dodge and Pomeranz also agreed that since they were now known to each other they would deal directly thereafter, and that Mrs. Pomeranz would no longer serve as their intermediary; accordingly, Dodge gave Pomeranz the phone number of Kennedy's Bar in the Bronx where he could be reached.

Pomeranz delivered the sample to Edwards at his apartment; Edwards stated that it would be shown to his contact the following day. Edwards also reported that no understanding had yet been reached on his and Pomeranz' share of the proceeds but he still believed they would receive between 15%–20%.

9. The jury could well have inferred, in the light of all the evidence, that Edwards had already contacted someone in connection with the deal, and that prior to discussing the details of the transaction with Pomeranz, Edwards had begun seeking out contacts for distributing the stolen securities and had taken this matter up with Parness.

The sample was quickly passed down the line from one to another; at a meeting in Parness' car between Parness and Sessler, Parness took the 100 share certificate from the trunk of his car and showed it to Sessler. Parness explained that this was a sample and that the other securities available were similar in form. Sessler indicated his willingness, with Lowe, to participate in the distribution of the stock. Edwards later reported to Pomeranz that the sample had been shown to his contacts and that, in a few days, he would let Pomeranz know when he required delivery of the bulk of the stock. Soon thereafter, Pomeranz told Dodge his "man thought it was great and that he would need at least a million dollars worth."

Dodge relayed this information to Tallman and on June 8, at 9:00 A.M., Tallman phoned Dodge, declared that he was "all ready" and asked Dodge if he could "get it from him that day." At first, Dodge suggested that they meet again at the Coachman Bar; however, a different bar on William Street was finally agreed upon as the meeting place. At about noon, Tallman and Dodge entered the men's room of the bar where Tallman removed from the inside of his shirt a manila envelope which he handed to Dodge, who, in turn, tucked it into his trousers. Tallman suggesed that Dodge compile a list of the certificate numbers "because they are our only protection."

After leaving, Dodge immediately proceeded to his "hangout" at Kennedy's Bar in the Bronx. In the men's room there, he opened the manila envelope and counted approximately seventy 100 share certificates of such "blue-chip" securities as A. T. & T., I. B. M., G. M., DuPont and Standard Oil of New Jersey, all in the name of Bache. As instructed, he compiled a list of the certificate numbers and then placed the securities in a cigar box

which he secreted in the trunk of Mrs. Kennedy's automobile.

Meanwhile, Sessler was making arrangements for the disposition of the stock. Having determined that his organization, an over-the-counter firm, could not undertake to sell securities listed on the New York Stock Exchange, Sessler, at Lowe's suggestion, contacted appellant Max Jakob with whom Sessler had previous business dealings. Jakob and defendant William Gladstone were partners in Wilco Commercial Corp. (Wilco), a business engaged in interim financing and the sale and trading of put and call options. Jakob visited Sessler's office where Sessler explained that there was a large quantity of securities available which were going to be taken by a partner at Bache who needed the money to pay off his gambling losses. Sessler also noted that, because of the partner's position, the loss would not be discovered for some time. While Jakob expressed interest, he noted that until he had reviewed the proposal with his partner, Gladstone, he could not commit himself.

Jakob did not delay in discussing the proposed transaction with Gladstone.[10] He noted that the securities could be utilized to rescue Wilco from financial straits caused by the general decline of the stock market in the Spring of 1962.[11] Gladstone, who was deeply in debt to Jakob, pointed out that they ran the risk of criminal sanctions if their participation was discovered; however, when Jakob stressed Wilco's need for funds and indicated his intention to become involved, Gladstone decided to go along.

Jakob, Gladstone and Sessler thereafter met several times to discuss what each would realize from the transaction. Jakob and Gladstone indicated that they would distribute and sell the securities for 50% of face value. Sessler protested,

10. Jakob and Gladstone had hoped to obtain $450,000 from a refinancing of property owned by Mrs. Jakob, but, for reasons not related to this case, she declined to give her approval.

11. Gladstone's law partner, defendant Bert Markowitz, was present during some of these discussions. Gladstone and Markowitz were disbarred for professional misconduct concerning their handling of negligence cases.

however, stating that this would be an impossible arrangement since he was paying 55% to obtain the stock. After further negotiation, it was finally agreed that Sessler would receive 5% while Jakob and Gladstone would obtain the remaining 40%. Jakob told Sessler that since they were dealing with large amounts, percentages were not all that important and besides, " * * * I have good connections in Europe and elsewhere, and don't be so selfish, and we can make some money not only today, but in the future."

Between June 8 and June 16, Pomeranz and Edwards were in communication with each other concerning the delivery of the stock, and, on Saturday, June 16, Edwards told Pomeranz that he was ready. Pomeranz relayed this information to Dodge who borrowed Mrs. Kennedy's car and met Pomeranz at 89th Street and Columbus Avenue in Manhattan. Pomeranz explained that although the front money matter had not been settled, his contacts were ready "to start doing business." The two drove to Edwards' apartment where Dodge waited in the car while Pomeranz went inside. He returned shortly, however, noting that negotiations concerning front money were still in progress and that they should wait for a while before delivering the stock. Accordingly, Pomeranz and Dodge went to a drugstore and after several phone calls to Edwards, Pomeranz told Dodge that no front money was available but that if they turned over the stock, they would receive $5,000 every 4 business days until their share of the proceeds had been paid. Dodge reluctantly agreed, removed the cigar box containing the stock from the trunk of Mrs. Kennedy's car and gave it to Pomeranz who wrapped it in a newspaper. Pomeranz brought this crudely concealed package to Edwards' apartment where it was opened revealing $1,005,000 worth of securities registered in the name of Bache. Because front money had not been furnished, Edwards and Pomeranz decided that only $100,000 should be turned over to Edwards' contact. Dodge phoned Tallman to report what had transpired.

Several days later, Parness gave Sessler three 100 share certificates of I. B. M., DuPont and A. T. & T. stock registered in the name of Bache. Sessler showed them to Jakob who remarked that "they look like diamonds"; ultimately, Sessler turned this stock over to Jakob.[12] At a meeting in Jakob's apartment, Gladstone outlined to Jakob and Sessler his proposal to distribute the stock through two channels: the plan called for a "small man," living in New Jersey, to deal with brokers and banks and a "big man" to efficaciously dispose of large amounts. Gladstone's "small man" was co-conspirator Benjamin Clott and his "big man" was appellant John Lombardozzi. The plan was accepted and shortly thereafter Gladstone and Markowitz discussed the proposal with Clott who was anxious to participate. Toward the end of June Jakob gave Gladstone the three certificates he had received from Sessler, and Gladstone surreptitiously delivered them by ostensibly abandoning the securities—hidden in a newspaper—in a phone booth to be retrieved by Clott who was close by.

Lombardozzi was brought into the scheme by Markowitz who had been his lawyer at one time. Lombardozzi was informed by Gladstone at a meeting at the law offices of Gladstone and Markowitz of the availability of "blue-chip" stock registered in Bache's name. Thereafter, he witnessed Gladstone give Sessler $10,000 cash, in an automobile in which Gladstone, Lombardozzi and Sessler were present, for the purpose of acquiring $100,000 worth of stock. For some undisclosed reason, Sessler was unable to obtain the stock from Parness and thus returned the $10,000 to Gladstone who,

12. The testimony is unclear as to whether Sessler gave this stock to Jakob who, in turn, delivered it to Gladstone or whether Sessler gave it directly to Gladstone. On direct examination Sessler testified that he turned the stock over to Jakob; on cross examination, he indicated that he passed it to Gladstone.

in turn, gave it to Lombardozzi. A day or two later, however, a parcel of the appropriated stock was acquired in the following manner: Sessler, Gladstone and Lombardozzi drove to Lexington Avenue and 57th Street where Sessler met Parness and defendant Martin Carbone in the Mayflower Restaurant. Parness told Sessler the stock would be arriving shortly. After a brief discussion, Sessler, Parness and Carbone went outside; Carbone crossed the street and talked briefly with defendant George Martinelli who handed him a newspaper. Simultaneously, Sessler gave Parness the $10,000, which had previously been given to him by Gladstone, and then crossed the street to meet Carbone in a drugstore. Carbone turned the newspaper over to Sessler; secreted in its folds were securities registered in the name of Bache & Co. Sessler then proceeded to the automobile in which Gladstone and Lombardozzi were waiting and gave the newspaper containing the stock to Gladstone who passed it to Lombardozzi.

The $10,000 received by Parness was not distributed in one installment. After Pomeranz had spoken to Edwards several times concerning payment, Edwards reported that he had received $2,000 to show "good faith." Pomeranz, who had expected to receive $5,000 to give to Dodge and Tallman, expressed disappointment but nevertheless took the $2,000. After explaining to Dodge that he was without funds and was for that reason keeping $100 for himself, Pomeranz gave him the balance. Dodge retained $900 and delivered the remaining $1,000 to Tallman.

During the last week in June, Edwards told Pomeranz that he had received $8,000 more but had given $100 to the courier who had delivered it. Edwards and Pomeranz divided the remaining $7,900, Edwards keeping $2,500 and Pomeranz receiving $2,400 plus an additional $3,000 which he later gave to Dodge to be split with Tallman. Pomeranz indicated to Edwards his dissatisfaction with not having received more money in view of Edwards' distribution of an additional $100,000 of stock. Edwards consoled Pomeranz by stating that he expected to receive their full 15%–20% of the proceeds and that his people might well pay an amount "over and above our percentage and buy another three, four or a half million dollars worth of stock."

On June 28, the first "outside" disposal of the stock was attempted. Isidore Gorlitsky, working for Clott and posing under the pseudonym, "Edward Adler," met with one Marvin Tabak, a registered representative employed by the brokerage house of Kesselman & Co. Gorlitsky, claiming to have been sent by an anonymous mutual friend and to have $1,000,000 worth of securities to sell, produced three 100 share certificates of I. B. M., A. T. & T. and DuPont stock, registered in the name of Bache and valued at approximately $63,000, which he asked Tabak to sell. Tabak refused unless adequate proof of ownership was submitted and the unidentified friend disclosed. At Gorlitsky's request, Tabak met Gorlitsky at 6 P.M. of the same day at a diner, on the Belt Parkway, for further discussions concerning the proposed sale. Gorlitsky offered Tabak a "bonus" of $500 above his regular commission for each $100,000 of stock sold but Tabak replied, "I don't have to take any extra money. We will sell [them] * * * for you if the stocks are legitimate."

The following day, Gorlitsky gave Tabak the three certificates in exchange for appropriate receipts. Tabak explained that Gorlitsky should return four business days later on July 2 to collect the proceeds of the sale provided he would present proof of ownership. In the course of their meetings, however, Tabak had become suspicious and, as soon as Gorlitsky departed, he asked the office manager to check with Bache concerning these certificates.

Gorlitsky immediately passed the word that proof of ownership in the form of completed transfer slips was needed to consummate the sale. Clott called Gladstone, reported Gorlitsky's progress and asked what could be done to obtain the appropriate documents. Gladstone re-

layed this information to Jakob and then to Sessler who phoned Parness. Parness apparently conveyed this information to Edwards because upon Pomeranz' inquiry about additional payments, Edwards replied that the proceeds from the sale could not be collected until transfer slips were presented. Pomeranz accordingly contacted Dodge who in turn called Tallman at Bache and described the plight they were in. Tallman, replying that it was "no problem," arranged to meet Dodge the following day; at that time he delivered a packet of blank Bache & Co. transfer slips. These were passed along the line from Dodge to Pomeranz to Edwards to Parness to Sessler. In the presence of Sessler, Gladstone and Markowitz, Lowe typed identification and other relevant data on the slips, and Gladstone delivered them to Clott. On July 2, Gorlitsky presented the slips to Tabak at Kesselman & Co. By this time, however, the police, as a result of investigating at Bache, arrested Gorlitsky.

Gorlitsky's arrest produced a wave of deep apprehension all along the alleged conspiracy chain. Clott called Gladstone and stated that there was "beaucoup trouble" because "his man" had been arrested while attempting to negotiate the securities. Gladstone reported this information to Sessler, who had come to Gladstone's office on other business, but Gladstone assured him that bail and counsel would be furnished. That evening, Gladstone informed Jakob of Gorlitsky's arrest and that Bache had apparently discovered that some securities were stolen.

Tallman quickly became aware that something had gone awry. On July 2, he called Dodge from Bache to report that the police were "all over the place" and that he "heard on the grapevine that somebody had been arrested regarding this stock." Tallman counseled caution should Dodge seek to communicate with Pomeranz. Later that day, however, Pomeranz called Dodge and when Dodge related what had transpired, Pomeranz stated that he had already been informed of the arrest and that there was little reason for excessive concern since the person who had been apprehended was a mere "flunky, * * * a bookie from Florida," who "didn't know a thing."

Parness also pressed Sessler for information as to what had gone wrong. Sessler played down the arrest, assuring Parness that while it was unfortunate, it was not a serious setback.

Edwards' anxiety over the arrest was not easily assuaged. In his presence, Pomeranz called Dodge and asked whether Tallman could be setting "traps" since people were being arrested "all over the place." When Dodge assured Pomeranz that Tallman was not cooperating with the authorities, Pomeranz replied, "Well, you tell that to my boy Bobby," and put Edwards on the phone for further reassurance.

Despite Gorlitsky's arrest, money continued to be distributed among the participants in the scheme. On July 5, Edwards told Pomeranz that he had met his contact and received an additional $8,000. Edwards retained $2,500 and gave the balance to Pomeranz who kept $2,500 for himself and later delivered the remaining $3,000 to Dodge. Pomeranz pointed out that although approximately $200,000 worth of stock had been distributed, they had received only $18,000 which was $12,000 less than their 15% share; Edwards replied that the balance would be forthcoming shortly.

During the period that Gorlitsky had been attempting to dispose of the stock allocated to Clott, Lombardozzi, the so-called "big man," working through Robert Francine, attempted to dispose of securities amounting to $100,000 which he had received from Sessler. On June 28, Lombardozzi asked Herman Weinstein, a securities trader at L. P. Denenberg & Co., if he could sell "blue-chip" stock registered in a street name. Weinstein, not yet qualified as a registered representative, suggested that his employer, Lee Denenberg, could do so. Lombardozzi advised Weinstein that a friend of his would contact him the following day.

As scheduled, the next day Robert Francine, having introduced himself as a friend of "John Lombardo," came to Weinstein's office and upon inquiry by Francine was told by Weinstein that proceeds from the sale of stock could not be collected until four business days after sale. Francine then produced three 100 share certificates of Polaroid, DuPont and General Motors stock registered in the street name of Bache which was turned over to Weinstein and for which he was given a receipt. After checking the serial number of the DuPont certificate with the clearing house and ascertaining that no stops had been issued against it, Denenberg sold the three certificates. On July 3, Denenberg traded an additional 100 share certificate of DuPont in Francine's behalf. At Weinstein's suggestion, Francine also utilized the offices of S. P. Levine & Co., a brokerage firm, to dispose of more stock. Agreeing to a "cash trade" resulting in payment within 24 hours at a penalty of from $\frac{1}{8}$ to $\frac{1}{4}$ a point per share, Francine sold through the Levine offices 200 shares of G. M., A. T. & T. and Standard Oil of New Jersey registered in the name of Bache for approximately $41,000.

On July 5, Weinstein gave Francine two checks, drawn on the account of L. P. Denenberg & Co., to cover the proceeds of the stock Denenberg sold in Francine's behalf. Francine was told, however, that the checks could not be cashed for 3 additional business days.[13] The following day, Lombardozzi gave Sessler the two Denenberg checks and suggested that they be used to purchase additional stock. After discussing this proposal with Parness, who insisted upon receiving cash, Sessler returned the checks to Lombardozzi. Even upon speaking directly to Lombardozzi,[14] Parness remained adamant in demanding cash. That evening, when Pomeranz visited Edwards' apartment, he was shown the two Denenberg checks. Upon

Pomeranz' inquiry concerning their remaining $12,000 share, Edwards explained that the checks would be cashed in a few days and they would then be paid.

On July 9, Francine received a check from S. P. Levine & Co. for approximately $30,000 in partial payment for the stock the Levine firm sold at his request. But, when Francine learned from Levine's bank that there were insufficient funds to reduce the check to cash, he angrily returned to Levine's office where, in an attempt to placate him, he was offered two checks—one for $9,000 and the other for $21,000—with the suggestion that the smaller could be cashed immediately. Francine flung the checks on the table and demanded cash or a certified check. When neither was forthcoming he left in anger. A short while later, Weinstein told Levine that he received a call from Denenberg, who had discovered a problem with the stock, and recommended that Levine "hold up on the trade."

Later that day, Edwards informed Pomeranz that a stop had been placed on the certificates and that if the remaining $850,000 of stock was not turned over to his associates without payment, he would be "in the jackpot." Edwards pointed out that his contacts believed they had been betrayed and would hold him responsible if the additional stock was not immediately forthcoming. Concerned over Edwards' welfare, Pomeranz consented telling Edwards that under these circumstances "money [becomes] meaningless." Edwards observed that if the stock was surrendered, he and Pomeranz might still receive 10% of its face value.

Accordingly, Edwards turned over the remaining securities and, in the middle of July, Clott informed Gladstone that he found a customer—"a big buyer on the West Coast"—who was interested in purchasing the Bache certificates which had not yet been reported as missing or

---

13. This extra time was required so that the checks given to Denenberg in payment for the stock could clear.

14. This was the first time that Sessler introduced Lombardozzi to his contact.

stolen. After conferring with Jakob, Gladstone obtained from Sessler a list of the numbers of those certificates which were available for sale. This list, designed to aid the "West Coast" buyer in determining which securities he wished to purchase, was delivered by Gladstone to Clott. Gladstone then reported to Jakob that he had obtained the list of securities and delivered it to Clott. Jakob expressed pessimism over making any money on the transaction but noted that in view of Wilco's critical financial situation, anything "would be helpful at this point."

Initially, it was arranged that Clott's buyer would be met at Idlewild Airport in New York (now Kennedy International Airport), but the plans were changed and the transfer of the stock was fixed for July 20 at the Robert Treat Hotel in Newark, New Jersey. But, here the plot thickens for unknown to the other participants in the scheme, Clott had begun cooperating with the F. B. I. and his "customer" was actually Special Agent Ralph Desena using the pseudonym "Ralph Cava." On July 20, Desena occupied Room 911 in the Robert Treat Hotel; in midafternoon, Clott accompanied by Parness, Lombardozzi and Martinelli entered the room and, after introductions, negotiations commenced. Desena stated that he was given to understand that he was to pay 40% of face value for those certificates which had not been reported as missing and 10% for the others. Parness stated that the deal was only for "clean" certificates for which Desena was to pay 35%. Parness noted that the "other stuff" could not be sold for 10% since more than that was paid for it. Deferring discussion on the securities reported as missing, Parness told Desena that he was prepared to sell two I. B. M., four A. T. & T., five General Motors and seven Standard Oil certificates, each representing 100 shares. Desena checked Parness' calculations and agreed that 35% of the face value of these securities came to $61,836 based on the prices listed in that morning's New York Times. When Desena indicated willingness to make

payment, Parness left the room to gather the stock. Lombardozzi then asked Desena about his interest in the certificates which were listed as missing and noted that they could be obtained in an hour and a half. When Desena equivocated, Lombardozzi explained that "the other stuff is good, it's just hot" and added that "unfortunately something happened to us" which led to the discovery by Bache of the missing securities.

At this point, Desena answered a knock on the door. It was Carbone who asked for Martinelli and handed him a newspaper in which an envelope had been secreted. Opening the envelope, Martinelli removed 18 certificates and handed them to Desena who, after inspecting them to assure himself that they were the stolen Bache securities, left the room explaining that he would return shortly with the money.

A few moments after Desena left, other F.B.I. agents entered Room 911, arrested Lombardozzi and Martinelli and found the 18 certificates under a pillow as well as a list published by the National Association of Securities Dealers (NASD) containing the numbers of the certificates reported as stolen from Bache. It is interesting that none of the certificates found in the room were described on the NASD list. Edwards, Jakob and Parness were apprehended subsequently.

### I.

We shall first consider those contentions raised by appellants which affect all or several of them. We shall then discuss additional arguments specifically raised on behalf of particular defendants.

#### SUFFICIENCY OF THE EVIDENCE

The above detailed statement of the facts has been necessitated by the vigorous attack made upon the evidence and the sufficiency thereof.

Appellants raise the not unfamiliar contention that the evidence demonstrated the existence, not of a single conspiracy, but of at least two. It is argued that the first conspiracy was composed of Tallman, Dodge, Pomeranz and Edwards who were concerned with appropriating the

stock and its initial distribution; the second conspiracy, it is contended, was comprised of Parness, Sessler, Jakob, Gladstone, Lombardozzi and others who participated in subsequent distribution efforts. Appellants press upon us that there was no proof of any link between the two groups.

■ The evidence, however, amply refutes this contention and discloses the classic single "chain" conspiracy. The circulation of the certificate for 100 shares of General Motors stock as a "sample," the identity between the numbers of the certificates reported taken from Bache and those offered for sale at the New York brokerage houses and in New Jersey; the passing along the line of the Bache and Co. transfer slips and the Denenberg checks, the interconnection and linkage in one form or another of all the participants in the disposal of the securities stolen by Tallman from Bache, provided sufficient evidence of a single conspiracy to justify submission to the jury of the question as to whether there was one overall scheme. The trial judge's instruction in this connection properly focused the jury's consideration of this question and the jury's verdict determining that one overall conspiracy to transport securities in interstate commerce cannot be faulted.

■ The evidence also refutes Edwards' contention that there was no proof that he ever dealt with Parness. The jury could have inferred these dealings from incidents such as that testified to; for example, that Pomeranz delivered the Bache & Co. transfer slips to Edwards which ultimately ended up in the possession of Parness who subsequently turned them over to Sessler. And, it is black letter law that all participants in a conspiracy need not know each other; all that is necessary is that each know that "it has a 'scope' and that for its success it requires an organization wider than may be disclosed by his personal participation." United States v. Agueci, 310 F.2d 817, 827, 99 A.L.R.2d 478 (2d Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1016, 10 L.Ed.2d 12 (1963); United States v. Stromberg, 268 F.2d 256 (2d Cir.), cert. denied, 361 U.S. 863, 80 S.Ct. 123, 4 L.Ed.2d 102 (1959). The "chain" type of conspiracy has as its purpose the disposal of the tainted commodity into the hands of the ultimate purchaser. See United States v. Agueci, supra.

■ Jakob asserts that there was insufficient proof that the securities were actually stolen or that he possessed knowledge of this. The surreptitious and furtive transfers of the stock from Tallman to Dodge and from Dodge to Pomeranz in bars and lavatories for a fraction of its face value and the other unorthodox methods utilized in its disposition are ample evidence from which the jury could draw an inference of theft. Moreover, Gladstone's conversations and activities with Jakob and his testimony that he warned Jakob of possible criminal sanctions if their participation in the disposal plan was discovered leaves little room for argument that the jury could not have drawn the inference that Jakob was fully aware that he was dealing in stolen stock.

■ Lombardozzi also raises the question that the evidence was not sufficient to show that he was a knowing participant in the conspiracy. We need not linger long over this contention for our recital of the evidence clearly demonstrates that there was ample support for the verdict that he was a knowing participant in the scheme.

## ENTRAPMENT

Jakob and Lombardozzi maintain that their convictions should be reversed because the commission of the offenses was the result of entrapment by the government working through Clott and Special Agent Desena. The crux of their argument, as we understand it, is that the government added the interstate element to the offenses charged by arbitrarily switching the transaction with Desena from ·Idlewild Airport in New York to the Robert Treat Hotel in New Jersey.

■ We find this argument unpersuasive. Entrapment results from overzealous activity by government

agents designed to incite an innocent man to crime. But, "[a]rtifice and stratagem may be employed to catch those engaged in criminal enterprises." Sorrells v. United States, 287 U.S. 435, 441, 53 S.Ct. 210, 212, 77 L.Ed. 413 (1932). In the present case, the government did no more than afford the opportunity and facilities for the commission of the offense charged; the participants were awaiting "any propitious opportunity," see United States v. White, 223 F.2d 674, 676 (2d Cir.), cert. denied, 350 U.S. 888, 76 S.Ct. 143, 100 L.Ed. 782 (1955); United States v. Riley, 363 F.2d 955 (2d Cir. 1966), and never considered themselves limited by New York State's boundaries. Indeed, when the scheme was in its early stages, Pomeranz suggested to Edwards that the stock should be disposed of outside New York, and Jakob and Lombardozzi mentioned Europe as a possible place for sale. Moreover, it is significant that no evidence on the question of entrapment was introduced at trial, the issue was not adverted to in any of the defense summations and no instructions to the jury on the subject were requested. Indeed, the only and solitary mention of entrapment occurred immediately prior to the court's charge when Lombardozzi moved for acquittal on this ground. In view of the absence of any evidence of entrapment, Judge Wyatt correctly denied this motion.

### RECORDINGS OF THE CONVERSATIONS AT THE ROBERT TREAT HOTEL

 It is urged that the government invaded the constitutional rights of Lombardozzi and Parness under the First, Fourth and Fifth Amendments, by recording their discussions at the Robert Treat Hotel, concerning the sale of the Bache securities. While this general area of law is once again *sub judice* in the Supreme Court, see United States v. Osborn, 350 F.2d 497 (6th Cir. 1965), cert. granted, 382 U.S. 1023, 86 S.Ct. 644, 15 L.Ed.2d 538 (1966), we believe that on the facts and circumstances presented here, appellants' argument lacks merit.

The F.B.I. rented Rooms 911 and 912 at the Robert Treat;[15] appellants were invitees who had no property interest in the premises and, more significantly, were there voluntarily to further their own purposes. While the Supreme Court has not been undivided on this question, it has consistently held that the prohibition against unreasonable searches and seizures does not prevent the making and use of recordings of conversations between government agents and persons suspected of criminal activity. Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952); Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942). And, in dealing with a case quite similar to that presented here, we observed that "the planting of microphones in [a] hotel room with [the] consent [of its occupant does not amount] to trespass within the definition of the majority in On Lee, or approach the physical invasion of another dwelling without consent perpetrated with the spike mike whose fruits were excluded in Silverman v. United States, 365 U.S. 505 [81 S.Ct. 679, 5 L.Ed.2d 734] (1961)." United States v. Kabot, 295 F.2d 848, 854 (2d Cir. 1961), cert. denied, 369 U.S. 803, 82 S.Ct. 641, 7 L.Ed.2d 550 (1962). Moreover, we note that Agent Desena's testimony describing the conversations in which he participated with Lombardozzi and Parness was admitted without objection.

### THE CHARGE

 Appellants challenge the judge's charge in several respects.

Jakob urges that the court became an advocate and incorrectly marshalled the evidence and weighted it in favor of the prosecution. We have carefully reviewed the court's instructions and find this contention without merit. Since most of the trial was occupied with the presentation of the government's case, it was to be expected that the judge would devote more time to the government's case

---

15. The microphone was placed in Room 911 and the recording equipment was placed in Room 912.

in summarizing the evidence. See United States v. Dardi, 330 F.2d 316, 330 (2d Cir.), cert. denied, 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50 (1964); United States v. Kahaner, supra, 317 F.2d at 476. Moreover, Judge Wyatt gave the usual admonition to the jury that its recollection of the facts and not his was controlling, that it must consider all of the evidence and not merely that mentioned by the court, and that the jury was the sole judge of the facts. In addition, just before submitting the case to the jury, Judge Wyatt instructed them:

> * * * I could not possibly, in attempting to summarize the contentions of the parties mention everything. * * * [Y]ou are to draw no conclusions from my failure to include something in this summation.

We find no error in the judge's marshalling of the evidence. See United States v. Bentvena, 319 F.2d 916, 940 n. 14 (2d Cir.), cert. denied [Ormento v. U. S., Di Pietro v. U. S., Fernando v. U. S., Panico v. U. S., Galante v. U. S., Loicano v. U. S., Mancino v. U. S., Sciremammano v. U. S., Mirra v. U. S.], 375 U.S. 940, 84 S.Ct. 345, 346, 353, 354, 355, 360, 11 L.Ed.2d 271, 272 (1963). Indeed, the judge displayed an awareness and sensitivity to the management problems inherent in multi-defendant conspiracy cases. See United States v. Agueci, supra, 310 F.2d at 840.

█ Jakob also argues that the charge was deficient in failing to state that each participant in the conspiracy must have had knowledge that the conspiracy involved an element of interstate or foreign transportation. We find the instructions on this point to be unmistakably clear and correct. Judge Wyatt instructed the jury that it could convict only if it found beyond a reasonable doubt that the conspiracy embraced the concept that the stolen securities "shall cross state lines or move to foreign countries." The judge added that the jury was duty bound to acquit unless it found that the conspiracy comprehended "either expressly or by implication, the transportation of the stolen certificates in interstate

or foreign commerce." And, stressing the requirement of knowledge, the court added:

> So it must be shown beyond a reasonable doubt that the understanding of the conspirators, either expressly or by implication, was that the stolen certificates would move in interstate or foreign commerce.

Finally, the court noted that each defendant "must be found to have knowingly associated himself with the conspiracy."

█ We also find no error in that portion of the charge which instructed on the relationship between the conspiracy and substantive counts. The court charged that a defendant could be convicted on the substantive count of transporting stolen securities in interstate commerce (Count Two) if the jury found that the substantive offense was committed in furtherance of the conspiracy and that, at the time of the commission of the substantive offense, the particular defendant was a member of the conspiracy. This instruction was based upon and correctly reflects the teaching of Pinkerton v. United States, 328 U.S. 640, 66 S. Ct. 1180, 90 L.Ed. 1489 (1946). Jakob now urges, for the first time, that the court should have added that "the substantive offense must have been committed in furtherance of the conspiracy and not merely as an unforeseen part of the ramifications of the plan", citing United States v. Barrow, 229 F.Supp. 722, 733 (E.D.Pa.1964). While this addition would not have detracted from or confused the charge, Jakob did not request such an instruction and the district judge cannot be faulted for not utilizing additional words suggested by those having the benefit of afterthought.

█ Moreover, we see no merit in the criticism of the court's instruction on reasonable doubt; as given, it was similar to that approved in Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150 (1954) and United States v. Heap, 345 F.2d 170, 171 (2d Cir. 1965). Nor was it prejudicial error for the court to set forth the reasons why Congress re-

garded conspiracy as a crime meriting separate treatment from substantive offenses. While we see little purpose in advising the jury of the congressional intent in enacting the statute, the court did little more than paraphrase the language of United States v. Rabinowich, 238 U.S. 78, 35 S.Ct. 682, 59 L.Ed. 1211 (1915), quoted with approval in Pinkerton v. United States, supra, 328 U.S. at 644, 66 S.Ct. 1180, concerning the dangers of conspiracy.

### ADDITIONAL POINTS AFFECTING MORE THAN ONE APPELLANT

Further issues are raised which concern several or all of the appellants; they can conveniently be considered at this juncture.

■ It is urged that the fairness of the trial was vitiated when the government called Gordon Tallman to the stand knowing that he would refuse to testify and would claim the privilege against self-incrimination.[16] It is clear that the government suspected that Tallman might invoke the Fifth Amendment privilege; indeed, it had arranged for a Legal Aid attorney to be present to advise him and had submitted a memorandum to the court contending that the privilege was unavailable to Tallman on the ground that he was immune from further prosecution as the result of his plea of guilty to a federal conspiracy indictment and his conviction on a related state charge. We are convinced that the government called Tallman in good faith reasonably expecting the district judge to order him to testify.[17] Thus, we are not dealing with a case where the prosecution made "a conscious and flagrant attempt to build its case out of inferences arising from use of testimonial privilege," see Namet v. United States, 373 U.S. 179, 186, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963). Moreover, in contrast to United States v. Ma-

loney, 262 F.2d 535 (2d Cir. 1959), the government made no reference to Tallman's failure to testify; indeed, it requested that the jury be excused as soon as Tallman was sworn. And, the judge's instruction—not present in *Maloney*—removed any possible inference against the defense which the jury might have drawn from Tallman's refusal to testify.[18] See United States v. Romero, 249 F.2d 371, 375 (2d Cir. 1957).

■ Nor are we persuaded that the appellants were prejudiced by the guilty plea of co-defendant Leo I. Sagal on the first day of trial. Sagal entered his plea in the absence of the jury; the court then instructed that Sagal had pleaded guilty to the first count of the indictment which "is not evidence of the guilt of the defendants on trial here and gives rise to no inference against any defendant here." While it would have been preferable for the court merely to note that Sagal had been excused and that the trial would proceed without him, any possible error was cured by its cautionary instructions. See, e. g., United States v. Dardi, supra; United States v. Aronson, 319 F.2d 48 (2d Cir.), cert. denied, 375 U.S. 920, 84 S.Ct. 264, 11 L. Ed.2d 164 (1963); United States v. Crosby, 294 F.2d 928 (2d Cir. 1961), cert. denied [Mittleman v. U. S., Pettit v. U. S., Meredith v. U. S.], 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962).

■ It is argued, also, that the court committed prejudicial error in refusing to order the government to produce Clott at trial. But, the government is not obliged to produce witnesses who are not within its control, see United States v. D'Angiolillo, 340 F.2d 453 (2d Cir.), cert. denied, 380 U.S. 955, 85 S.Ct. 1090, 13 L.Ed.2d 972 (1955); its responsibilities are satisfied when it discloses a potential witness' name and last

16. This claim is made for the first time on appeal.

17. The government attorney did not realize that Tallman was not immune from prosecution for income tax evasion or from aiding and abetting the commission of the substantive offense.

18. The judge told the jury:
The second witness [i. e., Tallman] * * * has been excused by order of the Court. You are not to draw any inference from that fact of any sort, either for or against the government or for or against any defendant now on trial.

known address, see D'Ercole v. United States, 361 F.2d 211 (2d Cir. 1966), which the government did in this case. And, after obtaining this information the defense did not seek an adjournment for the purpose of locating Clott nor is there any indication in the record that he was subpoenaed. Moreover, there was no prejudicial error in the court's charge that since Clott was equally available to the prosecution and the defense failure to call him "may not be used * * * as the basis for an inference for or against the government or for or against any defendant." Cf., United States v. Armone, 363 F.2d 385 (2d Cir. 1966).

▮ We see no more than "harmless error" in the government's inadvertent failure to turn over F.B.I. Agent McDonald's grand jury testimony at trial. When this oversight was discovered approximately three weeks after trial, the government sent these minutes to Judge Wyatt who forwarded them to defense counsel. When several counsel moved for a new trial on the basis of the belated production of this transcript, Judge Wyatt denied the motions, observing that even if certain inconsistencies between McDonald's testimony before the grand jury and at trial discredited the Agent, "it wouldn't have the slightest effect on the verdict." We have examined McDonald's grand jury testimony and are unpersuaded that this ruling was not correct. McDonald's brief testimony at trial was of minimal importance and did no more than corroborate the evidence of Gladstone's meeting with Clott the day before the events at the Robert Treat Hotel. Although one court has suggested that the failure to produce prior statements of government witnesses is ground for reversal even in the absence of any demonstration of prejudice, Bergman v. United States, 253 F.2d 933, 935 (6th Cir. 1958), we have declined to reverse where non-production could properly be classified as "harmless error," see United States v. Kahaner, supra, 317 F.2d at 473.

## II.

Having considered those grounds urged for reversal which would affect several or all of the appellants, we proceed to the contentions raised by particular defendants in their own behalf.

### ASSERTED COMMENT ON JAKOB'S FAILURE TO TESTIFY

▮ Addressing the jury at the close of the trial, the government attorney stated that in reviewing the evidence for the jury Jakob's attorney had overlooked testimony which incriminated his client:

He forgot to mention, for instance, that William Gladstone testified uncontradicted that he, Gladstone, told Jakob on or about July 2 * * *.

Jakob's counsel interrupted, requested a conference out of the hearing of the jury and moved for a mistrial on the ground that the prosecutor had improperly commented upon Jakob's failure to testify by characterizing Gladstone's testimony as "uncontradicted." The judge denied the motion and immediately admonished the jury to disregard this statement and specifically directed them not to draw any unfavorable inference from the failure of Jakob to testify in his own behalf. The following day, the court in its charge repeated these instructions.

We are not persuaded that the prosecutor's comment followed by the court's immediate curative instructions resulted in reversible error. See United States v. Agueci, supra, 310 F.2d at 831; United States v. Stromberg, 268 F.2d 256, 271 (2d Cir.), cert. denied, 361 U.S. 863, 80 S.Ct. 123, 4 L.Ed.2d 102 (1959). While the court's instructions may have to some extent called attention to Jakob's failure to take the stand, see Stewart v. United States, 366 U.S. 1, 10, 81 S.Ct. 941, 6 L.Ed.2d 84 (1961), counsel for Jakob did not object when the court indicated its intention to deliver them.

### VARIANCE BETWEEN THE INDICTMENT AND THE PROOF

▮ Jakob also contends that he was prejudiced by the three week difference between the date of overt act 8 as described in the indictment and the proof at trial. The indictment charged that in furtherance of the conspiracy, Jakob met with Gladstone, Markowitz and Sessler on

or about July 14, 1962. At trial, the government's evidence showed that the meeting took place on or about June 20. We do not regard this minor variance as fatal. See United States v. Armone, supra at ——; United States v. Glaze, 313 F.2d 757 (2d Cir. 1963). Although Judge Wyatt informed counsel for Jakob that he could have any additional time which might be necessary to prove a defense because of the difference in dates, no request for a continuance was made.

## PARNESS' DOUBLE JEOPARDY AND RIGHT TO COUNSEL CLAIMS

Parness asserts that his conviction in the present case was based on the same conspiracy for which he was convicted in United States v. Parness, 331 F.2d 703 (3d Cir.), cert. denied 377 U.S. 993, 84 S.Ct. 1919, 12 L.Ed.2d 1045 (1964) and that, therefore, he was placed in "jeopardy" twice for the same crime in violation of the Fifth Amendment.

■ It is true that both convictions were for conspiracy to transport stolen securities in interstate commerce, in violation of 18 U.S.C. § 2314. However, there the resemblance between the two offenses ends. The New Jersey indictment charged a conspiracy lasting from June 1961 to January 1962, between Grimmett, Favata, McLaren and Parness to transport securities stolen from Hans and Plate. The present indictment charged a conspiracy between Dodge, Tallman, Pomeranz, Edwards, Sessler, Lowe, Gladstone, Markowitz, Lombardozzi, Carbone, Martinelli, Parness and others lasting from April 1962 to July 1962, to transport stock stolen from Bache & Co. While it is clear that "a single conspiracy cannot be split up for the purpose of prosecution," United States v. Cohen, 197 F.2d 26, 29 (3d Cir. 1952), this case plainly involves a conspiracy separate from that for which Parness was convicted in New Jersey. And, while it is true that there was mention in the New Jersey trial that Parness was making arrangements to deliver to Grimmett in the future $1,000,000 of securities, and that two persons identified as John and

George were present at a meeting in January 1962 when Parness received money for a future delivery of $1,000,000 worth of stolen stock, "George" being identified as George Martinelli, the source of the stock to be stolen in the future was not identified.

■ As we observed in United States v. Kramer, 289 F.2d 909, 913 (2d Cir. 1961):

Offenses are not the same for the purposes of the double jeopardy clause simply because they arise out of the same general course of criminal conduct; they are the "same" only when "the evidence required to support a conviction upon one of them [the indictment] would have been sufficient to warrant a conviction upon the other."

■ Applying this test, the evidence required to support a conviction upon the New Jersey indictment would not have warranted a conviction upon the present indictment; and the converse is equally true. The present case closely resembles United States v. Aviles, 274 F.2d 179, 193–194 (2d Cir.), cert. denied [Evola v. U. S., Santora v. U. S., Lessa v. U. S., Capece v. U. S., DiPalermo v. U. S., Genovese v. U. S., Palizzano v. U. S., Barcellona v. U. S.] 362 U.S. 974, 982, 80 S.Ct. 1057, 1058, 1059, 1068, 1071, 1073, 4 L.Ed.2d 1009, 1010, 1015, 1016 (1960), in which we rejected a similar claim of double jeopardy, where the appellants in a narcotics conspiracy case had previously been convicted of a narcotics conspiracy involving different principals, techniques, sources of supply and routes of distribution. Judge Wyatt carefully analyzed and compared the evidence in the two prosecutions and we are in agreement with his finding that two separate and distinct conspiracies were involved.

■ Nor are we persuaded by Parness' argument, resting primarily upon Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), that his Sixth Amendment rights were violated by Agent Desena's discussion and negotiation with him in the Robert Treat

Hotel without advising Parness of his right to counsel. Putting aside for the moment the fact that no objection on this ground was made to the admission of evidence of this conversation, see United States v. Indiviglio, 352 F.2d 276 (2d Cir. 1965), cert. denied, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966), we note that *Massiah* is inapposite. While Parness was under indictment for an unrelated conspiracy offense at the time of the meeting at the Robert Treat Hotel, we do not read *Massiah* as forever immunizing a defendant under indictment for a distinct and unrelated crime from the normal techniques employed by law enforcement officials to investigate other and wholly separate offenses. The F.B.I.'s plan to use Agent Desena as an informant would have been completely thwarted if Desena had been required to disregard his pseudonym and role as a participant in the scheme and give the caveat Parness suggests. Neither *Massiah* nor any of the other cases cited to us in this connection compel this illogical conclusion.

## LOMBARDOZZI'S PREJUDICIAL PUBLICITY POINT

██ While the trial was in progress, a New York newspaper published an article which reported *Carmine* Lombardozzi's arrest as a scofflaw and referred to him as the "Mafia King of Wall Street." Appellant *John* Lombardozzi moved for a mistrial contending that the adverse publicity concerning Carmine was likely to affect the jurors' view of John, who was his brother. Judge Wyatt properly denied this motion. The newspaper article made no mention that Carmine had a brother named John; and the only oblique reference at trial to a brother of John occurred when it was pointed out that John performed services for a company in which his brother (whose first name was not mentioned) was a principal. Thus, there was very little, if any, connection at trial between John and Carmine and the judge acted well within his discretion in declining to poll the jurors

to determine if their judgment had been affected by this news item; indeed, in the circumstances presented here, such polling might have served only to underline John's filial relationship with Carmine. See, e. g., United States v. Bowe, 360 F.2d 1 (2d Cir. 1966); United States v. Bentvena, supra, 319 F.2d at 934; United States v. Feldman, 299 F.2d 914, 917 (2d Cir.), cert. denied, 370 U.S. 910, 82 S.Ct. 1256, 8 L.Ed.2d 403 (1962).

## EDWARDS' NEWLY DISCOVERED EVIDENCE CONTENTION

We find no merit in Edwards' contention that the trial court erroneously denied his motions to reopen his case and for a new trial on the ground of purported newly discovered evidence which allegedly showed that Edwards could not have been present at places where Pomeranz testified they had met.

██ It was not until three weeks after Pomeranz completed testifying that Edwards made his claim; but, during that entire period Edwards knew the precise dates and places where Pomeranz described the meetings and conversations which they had. Moreover, although Edwards testified in his own defense, he never stated that it was geographically impossible for him to have been present where Pomeranz placed him—a claim made on his motion for a new trial. Finally, there was no satisfactory showing before the trial judge as to reasons why the supposed "documentary proof" which was allegedly in the hands of an accountant employed by Bache & Co.[19] in New York could not have been brought to the Court's attention during trial by the exercise of due diligence. In these circumstances, we cannot say that Judge Wyatt abused his discretion in denying the motion to reopen Edwards' case. See United States v. Houlihan, 332 F.2d 8 (2d Cir.), cert. denied, 379 U.S. 828, 85 S.Ct. 56, 13 L.Ed.2d 37 (1964).

██ Similarly, the district judge cannot be faulted for refusing a new trial to Edwards on the ground of newly

19. It is only coincidental that this alleged accountant was employed by Bache & Co.

discovered evidence. When Edwards requested additional time to submit "the documentary evidence" in support of this motion, Judge Wyatt granted him in excess of two weeks to present this material. But, nothing further was submitted, and, accordingly, the motion was denied as being "without merit." It is fundamental "that a defendant seeking a new trial under any theory must satisfy the district court that the material asserted to be newly discovered is in fact such and could not with due diligence have been discovered before or, at the latest, at the trial." United States v. Costello, 255 F.2d 876, 879 (2d Cir.), cert. denied, 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958). See also United States v. Passero, 290 F.2d 238, 244–245 (2d Cir.), cert. denied, 368 U.S. 819, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).

### III.

We have carefully considered appellants' remaining contentions and find them without merit; accordingly, all of the convictions are affirmed.