UNITED STATES of America,
Plaintiff-Appellee,

v.

John GAMBLE, Defendant-Appellant.

No. 82–1151.

United States Court of Appeals,
Tenth Circuit.

June 20, 1984.

Michael Lerner of Barnett & Lerner, Overland Park, Kan., for defendant-appellant.

Amanda S. Meers, Asst. U.S. Atty., Kansas City, Kan. (Jim J. Marquez, U.S. Atty., Topeka, Kan., with her on the brief), for plaintiff-appellee.

Before HOLLOWAY, BREITENSTEIN and LOGAN, Circuit Judges.

LOGAN, Circuit Judge.

Defendant, John Gamble, a physician practicing in Kansas City, Kansas, was convicted on four counts of mail fraud, 18 U.S.C. § 1341. The charges against de-

fendant resulted from an elaborate undercover investigation by United States postal inspectors. On appeal, defendant contends that his conviction on all four counts should be overturned because (1) the government failed to prove beyond a reasonable doubt that he committed the crime of mail fraud, and (2) even if he did commit mail fraud, the government's conduct violated his right to due process of law. We also consider whether the government's conduct in this case was so outrageous that defendant's conviction must be overturned under our supervisory power over the administration of criminal justice.

United States postal inspectors concocted two schemes that ultimately involved defendant. In each scheme United States postal inspectors used fictitious names to obtain Missouri driver's licenses. The inspectors then registered automobiles they did not own and obtained insurance for the automobiles under those names. In cooperation with the Kansas City, Missouri, Police Department, the postal inspectors obtained accident reports for collisions that never occurred. The police officer who filled out the fictitious accident reports testified at trial that normally he would face severe sanctions for filling out false reports.

In each of the schemes the police issued a ticket to one of the inspectors and described the accidents in such a way that the inspector cited would be liable for any damages. After receiving the citations, the inspectors appeared in Municipal Court in Kansas City, Missouri, and pleaded guilty before prosecutors and judges who were unaware that the tickets were shams.

The first fictitious accident report, which was filed on May 6, 1980, described a one-car accident in which the driver of the vehicle, in an attempt to miss a stopped vehicle, swerved and struck a post. Postal Inspectors Armstrong and Gillis posed as passengers in the vehicle. Following this fictitious accident the inspectors visited defendant's office, asking him to help them perpetrate a fraud on the insurance company.

Posing as husband and wife, Armstrong and Gillis visited defendant's office seven times. On their first visit the inspectors' temperatures, weights, and blood pressures were checked. They filled out medical information forms, writing "traffic accident" in the blank for type of injury. When Inspector Armstrong met defendant, he told defendant that he had broken his glasses but had suffered no injuries and that he wanted to obtain some funds from the insurance company. Defendant described the procedure for filing claims with the insurance company and then conducted a routine physical examination of each inspector. On each subsequent visit the inspectors' weights, blood pressures, and temperatures apparently were checked. During the second visit defendant asked if he needed to do anything. Inspector Armstrong said no and stated that he had not yet contacted the insurance company. Subsequently, Inspector Armstrong told Jim Amen, an adjuster for State Farm Insurance Company, about injuries in his back and neck.

On the fourth visit the inspectors informed defendant that they had contacted State Farm Insurance Company. Later, Inspector Armstrong spoke with defendant's assistant, who prepared an insurance form and asked several questions. Armstrong told the assistant to write down that he had been unable to work for almost two months. When Inspectors Armstrong and Gillis visited defendant for the last time, they brought a draft from State Farm Insurance Company for $180, the total medical expense reported to the insurer. Defendant calculated that since they had already paid him $104, they owed him $66. (Correctly subtracted the figure was $76. Defendant had previously made the inspectors pay $10 or $12 apiece at each office visit when they saw defendant.) The inspectors gave defendant a $66 money order and kept the draft.

The second undercover operation began with a false accident report filed on July 9, 1980, which described a rear-end collision. Postal Inspectors Robert Bush and Don-

jette Gilmore posed as husband and wife and claimed to have been in the car that was hit. They visited defendant's office five times. Apparently at each visit the inspectors were given routine tests. When the inspectors first saw defendant, he asked what was wrong. Bush indicated that nothing was wrong but that the person who was responsible was insured and that there was a chance to make some money. Bush affirmed the doctor's stated assumption that they wanted to take advantage of the situation. Defendant then said, "You'll just have to play it up. You can't go out there tell that man ah, I wasn't hurt." Defendant also said, "You gotta have a back injury and you gotta have a neck injury or something.... We have to write it up to that effect and you'll make some money out of the deal." Defendant suggested neck and back injuries would be best because they are hard to prove and told them to come back in a few weeks to fill out the insurance papers.

Several weeks later the inspectors informed defendant that they had contacted the insurance company, and they discussed with defendant the insurer's method of handling claims. At a later visit defendant filled out a handwritten bill and put it in an envelope provided by the inspectors that was addressed to Farmers Insurance Group. Defendant handed the envelope back to Inspector Bush and asked him to take care of it. On December 11, 1980, the inspectors brought a draft for $160 from Farmers Insurance Group to defendant's office. A secretary reimbursed them for the $50 they had paid during previous office visits, and the inspectors signed the draft over to defendant.

## I

Defendant contends that his conviction on the four counts of mail fraud should be reversed because he did not devise the scheme to defraud insurance companies and because the mailings alleged in each count of the indictment were tangential to the scheme to defraud.

In *Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–363, 98 L.Ed. 435 (1954), the Supreme Court held that mail fraud under 18 U.S.C. § 1341 requires proof of (1) a scheme to defraud, and (2) the mailing or causing the mailing of a letter or other item for the purpose of executing the scheme. Under *Kann v. United States,* 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944), the federal mail fraud statute does not reach all frauds, but only those "in which the use of the mails is a part of the execution of the fraud." *Id.* at 95, 65 S.Ct. at 151. The mailing must be for the purpose of executing the scheme or some essential part of the scheme, but it is "not necessary that the scheme contemplate the use of the mails as an essential element." *Pereira,* 347 U.S. at 8, 74 S.Ct. at 362.

■ The evidence in this case supports a finding that the mail was used in furtherance of the scheme. *Pereira* held that one causes the mails to be used when one "does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended." 347 U.S. at 8–9, 74 S.Ct. at 362–363. *See also United States v. Maze,* 414 U.S. 395, 399, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974); *United States v. Curtis,* 537 F.2d 1091 (10th Cir.), *cert. denied,* 429 U.S. 962, 97 S.Ct. 389, 50 L.Ed.2d 330 (1976). In another case involving a scheme to defraud insurance companies for "staged accidents," the Fifth Circuit rejected a defendant's argument that the mailings did not violate the mail fraud statute. The court held:

"The evidence in this case shows that the mails were used to obtain approval of the defendant's applications for insurance payments and to send checks from the insurance companies' main offices in Iowa to local agents in Florida who transmitted the checks to the defendants. Such use of the mails by adjusters, local agents, and insurance companies as part of the usual business practice in settling and paying claims was reasonably fore-

seeable by the defendants and was an essential step in the process by which they obtained the fruits of their plot." *Glenn v. United States*, 303 F.2d 536, 541 (5th Cir.1962), *cert. denied*, 372 U.S. 920, 83 S.Ct. 734, 9 L.Ed.2d 725 (1963). In the instant case Jim Amen, a senior claims adjuster for State Farm Insurance Company, testified at trial that he routinely sends a request for a medical report through the mails and that he also uses the mails to send out settlement drafts. Another adjuster gave similar testimony. Defendant admitted in tape recorded meetings with the inspectors that he knew the mails would be used to execute the scheme.

Defendant also raises the question whether the scheme in this case meets the requirements of § 1341 because it was concocted by government agents. "Mail fraud is established by proof that the defendant schemed to obtain money by false representations and that the mails were used in furtherance of the scheme." *United States v. Themy*, 624 F.2d 963, 964–65 (10th Cir.1980). The scheme requirement is met even if defendant joined a scheme devised by someone else. *See United States v. Toney*, 598 F.2d 1349, 1356 (5th Cir.1979), *cert. denied*, 444 U.S. 1033, 100 S.Ct. 706, 62 L.Ed.2d 670 (1980). A defendant is chargeable for another's use of the mails in furtherance of a scheme, as long as the defendant had the requisite specific intent to defraud. *See United States v. Rasheed*, 663 F.2d 843, 847 (9th Cir.1981), *cert. denied*, 454 U.S. 1157, 102 S.Ct. 1031, 71 L.Ed.2d 315 (1982) (mail fraud requires a showing of specific intent to defraud). But mail fraud, unlike conspiracy, does not require an agreement. Thus, the fact that only one of the participants in a scheme actually had a specific intent to defraud does not bar conviction of the one who did have the requisite specific intent. *Cf. United States v. Newman*, 733 F.2d 1395 (10th Cir.1984) (defendant cannot "conspire" with government agents). Therefore, we hold that the scheme requirement is satisfied because the jury could have found that defendant had the requisite specific intent to defraud, even though govern-

ment agents formulated the scheme. The government's actions in formulating the scheme and drawing defendant into it are not to be condemned as failing to satisfy the "scheme" element; rather they must be condemned, if at all, on other grounds.

## II

Defendant contends that the government's conduct in formulating, carrying out, and enmeshing defendant in the mail fraud scheme was so outrageous that defendant's conviction should be overturned as a violation of due process of law. The Supreme Court recognized this defense in *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1641–42, 36 L.Ed.2d 366 (1973), when it stated, "[W]e may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, cf. *Rochin v. California*, 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183] (1952) ...."

When the Supreme Court considered the due process defense three years later in *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), the eight Justices who participated divided into three groups. The plurality opinion, written by Justice Rehnquist, stated that absent a violation of some protected right of the defendant, the Due Process Clause cannot be invoked to overturn a conviction because of governmental misconduct. Justice Rehnquist wrote, "The remedy of the criminal defendant with respect to the acts of Government agents ... lies solely in the defense of entrapment." *Id.* at 490, 96 S.Ct. at 1650. The due process defense survives, however, because a majority of the Justices, two who concurred in the result of the case and three who dissented, rejected the position "that the concept of fundamental fairness inherent in the guarantee of due process would never prevent the conviction of a predisposed defendant, regardless of the outrageousness of police behavior in light of the surrounding circumstances." *Id.* at 492, 96 S.Ct. at 1651

(Powell, J., concurring). *See also id.* at 497, 96 S.Ct. at 1653 (Brennan, J., dissenting). Justice Powell added, "I emphasize that the cases, if any, in which proof of predisposition is not dispositive will be rare. Police overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction." *Id.* at 495 n. 7, 96 S.Ct. at 1653 n. 7.

The defense that the government's conduct was so outrageous as to require reversal on due process grounds is often raised but is almost never successful. No Supreme Court case and only two circuit court opinions have set aside convictions on that basis. In *United States v. Twigg,* 588 F.2d 373 (3d Cir.1978), a Drug Enforcement Agency (DEA) informant, as part of a plea bargain, involved defendant Neville in establishing a laboratory for the production of a controlled substance, methamphetamine hydrochloride (speed). The government gratuitously supplied about twenty percent of the glassware and an indispensable ingredient, phenyl-2-propanone. The DEA made arrangements with chemical supply houses to facilitate the purchase of the rest of the materials, and the DEA informant, operating under a business name supplied by the DEA, purchased all of the equipment and chemicals with the exception of a separatory funnel. When the participants encountered problems in locating an adequate production site, the government solved the problem by providing an isolated farmhouse. The DEA informant provided the expertise to run the laboratory. Neither Twigg nor Neville knew how to manufacture speed, and each provided only minimal assistance at the specific direction of the informant. The Third Circuit stated, "[W]e are not only concerned with the supply by government agents of necessary ingredients for manufacture, but we also have before us a crime ... conceived and contrived by government agents." *Id.* at 378. It reversed both convictions. In discussing the government's conduct the court noted in regard to Neville,

"They [the government] set him up, encouraged him, provided the essential supplies and technical expertise, and when he and Kubica encountered difficulties in consummating the crime, they assisted in finding solutions. This egregious conduct on the part of government agents generated new crimes by the defendant merely for the sake of pressing criminal charges against him when, as far as the record reveals, he was lawfully and peacefully minding his own affairs. Fundamental fairness does not permit us to countenance such actions by law enforcement officials and prosecution for a crime so fomented by them will be barred."

*Id.* at 381 (footnote omitted).

In *Greene v. United States,* 454 F.2d 783 (9th Cir.1971), the Ninth Circuit overturned the defendant's conviction for the illegal manufacture of alcohol on due process grounds. An undercover agent established contact with defendants after their arrest for bootlegging. The agent supplied sugar at wholesale prices and offered to provide materials, an operator, and a location for the still. The agent was the sole purchaser of all the liquor produced at the still. *See also United States v. Batres-Santolino,* 521 F.Supp. 744 (N.D.Cal.1981) (government and its informant created and drew defendants into an elaborate drug smuggling ring; the court stated, "[T]his is a case in which government agents 'manufactured' a crime that this court concludes could not and would not have been committed if Bryan Thomas [the informant] had not inveigled defendants into it and offered to provide them with an otherwise unavailable source of supply of the illegal drug they were to import." *Id.* at 751.)

It is important to note that the entrapment defense, which requires an absence of predisposition to commit the crime, is not involved in the instant case. Nevertheless, in a sense, entrapment and the due process defense are on a continuum, because both are based on the principle "that courts must be closed to the trial of a crime instigated by the government's own agents. No other issue, no comparison of equities as between the guilty official and the guilty defendant, has any place in the enforcement of this overruling principle of

public policy." *Sorrells v. United States,* 287 U.S. 435, 459, 53 S.Ct. 210, 219, 77 L.Ed. 413 (1932) (Roberts, J., concurring). In stating that until the government provided the means to manufacture speed the *Twigg* defendant Neville was "minding his own affairs," the court notes precisely the point on the entrapment-due process continuum that the two concepts begin to merge. Although the due process defense purportedly ignores the defendant's predisposition to commit the crime charged, the defense nevertheless is concerned with the extent of government involvement in crime and the type of opportunity to become involved with crime that this conduct provides to the unwitting defendant. "[W]hen the government permits itself to become enmeshed in criminal activity, from beginning to end ... the same underlying objections which render entrapment repugnant to American criminal justice are operative." *Greene,* 454 F.2d at 787.

■ A defendant may not invoke the Due Process Clause, however, unless the government's acts, no matter how outrageous, had a role in inducing the defendant to become involved in the crime.

"[T]o be relevant at all, the government's conduct must be postured as connected in some way to the commission of the acts for which the defendant stands convicted. In cases decided since *Russell* ... this connection has been implicitly acknowledged by reference to the extent to which the government instigated, participated in, or was involved or enmeshed in, the criminal activity itself. Thus, the more immediate the impact of the government's conduct upon the particular defendant, the more vigorously would be applied *Russell's* test for constitutional impropriety."

*United States v. Spivey,* 508 F.2d 146, 149–50 (10th Cir.), *cert. denied,* 421 U.S. 949, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975) (footnote omitted). *See also United States v. Morrison,* 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981) (even assuming that egregious conduct of government agents violated the Sixth Amendment, dismissal of indictment was not an appropriate remedy when the conduct had no adverse effect on

criminal proceeding). In *Spivey,* the defendant, after being released from prison where he served a term for robbery "to get drugs," *id.* at 148, met a paid DEA informant and eventually moved into the informant's apartment. The informant played the part of defendant's friend and supplied him with free rent, food, and quantities of marijuana. The court said, however, "The sources for heroin were defendant's own, and his predisposition to engage in drug activity was in no way forced," *id.,* and went on to reject defendant's argument that the conduct of the government informant was so outrageous that it violated due process of law.

In the case at bar the government conceived and directed a crime in which defendant participated. The government used fictitious names to obtain driver's licenses, obtained insurance under those names for automobiles they did not own, orchestrated the production of false accident reports, appeared in court and pleaded guilty to traffic violations, and solicited defendant's aid in making false claims against insurance companies. Of the government agencies involved only the Kansas City, Missouri, Police Department knew of the operation. Involved without their knowledge were judges, prosecutors, state licensing authorities, and insurance companies. The government agents submitted the false claims to the insurance companies and lied to the companies about their injuries.

This conduct is very similar to that before the Second Circuit in *United States v. Archer,* 486 F.2d 670 (2d Cir.1973), a case involving the investigation of corruption in the New York criminal justice system.

"In this case the Government argues, its conduct did not infringe the rights either of the defendants or of any third parties .... Yet the Government agents displayed an arrogant disregard for the sanctity of the state judicial and police processes. The investigators apparently permitted their deserved contempt for corrupt practitioners in the Queens criminal justice system to spill over into disdain for all the participants in the system—including the police, the courts, and

the members of the grand jury, all of whom were subjected to the Government's fabrications....

Since we conclude reversal to be required on another ground, we leave the resolution of this difficult question for another day. We hope, however, that the lesson of this case may obviate the necessity for such a decision on our part."

*Id.* at 677. We share the Second Circuit's sentiments.[1] The government agents in the case before us displayed shocking disregard for the legal system. But these actions did not directly induce defendant to participate in the fraudulent scheme. Perhaps the false statements to state agents and the courts helped the inspectors obtain the medical forms defendant filled out and ultimately secure the settlement check. But defendant did not rely on any display of fictitious credentials or falsified documents; apparently he relied entirely upon what his "patients" told him. Therefore, we must ignore these acts of the government agents in evaluating defendant's due process claim.

Some of the artifices that the government inspectors used in the scheme, however, did directly contribute to defendant's decision to participate. The postal inspectors, with their elaborate machinations, sowed the seeds of criminality and brought defendant into their scheme. This brings the case closer to government manufacture of crime than the sting, Abscam, and other operations in which undercover agents set themselves up as amenable to law-breaking schemes brought to them by others. But did the action of the government agents cross the due process line? We recognize that "because the difficulties in detecting covert crime often warrant secretive investigations, involvement of Government agents must be of the tenor to shock the

conscience before a violation of the due process clause will be found." *United States v. Alexandro,* 675 F.2d 34, 35 (2d Cir.1982), *cert. denied,* 459 U.S. 835, 103 S.Ct. 78, 74 L.Ed.2d 75 (1982). In common with other courts we have struggled to draw the line that defines and identifies what is governmental involvement so outrageous as to warrant finding a due process violation.

The government here enmeshed in criminal schemes fabricated entirely by government agents a black doctor who had no criminal record and with respect to whom the agents had no apparent hint of a predisposition to criminal activity. The government sent agents apparently posing as poor people to a doctor serving a ghetto community to seek to have the doctor help them out financially in appealing circumstances, circumstances in which the doctor might appear callous if he did not cooperate. The record implies that the inspectors pretended to be economically disadvantaged people typical of defendant's patient population. Sympathy based upon economic disadvantage or race may have been played upon as a factor in inducing defendant to join what he informed the inspectors was "the white boys' game." Defendant sought very little profit from his participation, apparently charging only normal office rates for the time he spent with the inspectors.

We must conclude, however, that the government's conduct was insufficient to violate defendant's right to due process. Insurance fraud on a small scale no doubt is very widespread in this country. Many professional or business people may not regard it a serious infraction of society's rules to assist customers or patients in the small scale cheating of insurance companies. Yet, like the Second Circuit in *Myers,* which said it could not accept an "induce-

---

1. The *Archer* case we quote above (*Archer I*) reversed a federal conviction under the Travel Act and ordered the indictment dismissed. After the same defendant was convicted in state court on bribery counts he sought to overturn his conviction by a writ of habeas corpus in federal court, and the Second Circuit had to review the police behavior again. *Archer v. Commissioner of Corrections,* 646 F.2d 44 (2d Cir.1981) (*Archer II*). After distinguishing its *Archer I* commentary as having been based upon principles of federal criminal process rather than constitutional due process applicable to state prosecutions, it found no due process violation. *Archer II's* due process analysis focused, as we do here, on the fact that the impermissible police conduct was not inflicted directly upon the defendant.

ment" argument that a proferred bribe was so large a congressman could not be expected to resist, 692 F.2d at 837–38, we cannot accept the notion that insurance cheating is so commonplace that it is improper for the government to try to catch and convict citizens who engage in it. We have held that the government need not have a reasonable suspicion of wrongdoing in order to conduct an undercover investigation of a particular person. *United States v. Biswell,* 700 F.2d 1310, 1314 (10th Cir.1983). *See also United States v. Salazar,* 720 F.2d 1482, 1488 (10th Cir.1983). *Cf. United States v. Swets,* 563 F.2d 989, 991 (10th Cir.1977), *cert. denied,* 434 U.S. 1022, 98 S.Ct. 748, 54 L.Ed.2d 770 (1978) (government not required to show in entrapment case that it had reasonable grounds to believe defendant was engaged in unlawful activities). No issue of impermissible selective prosecution was raised in the instant case. *See Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

### III

We have also considered defendant's conviction and the government agents' conduct in light of our supervisory power over the administration of criminal justice. But the breadth of the Supreme Court's language in *United States v. Payner,* 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980), requires us to conclude, despite the differences between *Payner* and the case at bar, that we may not fashion a "sub-constitutional" rule to permit dismissal of this case because of the government agents' conduct. *See United States v. Myers,* 692 F.2d 823, 847 (2d Cir.1982), *cert. denied,* — U.S. —, 103 S.Ct. 2437, 77 L.Ed.2d 1322 (1983). In *Payner* government agents sought to examine materials in a third party's briefcase that they thought might incriminate defendant. To gain access to the briefcase a government agent introduced the owner of the briefcase, Michael Wolstencroft, to Sybol Kennedy, a female private investigator who worked for the agent. Wolstencroft and Kennedy spent time together in Kennedy's apartment, where Wolstencroft left his locked briefcase while the two went out to eat at a restaurant. While one government agent acted as a "lookout" at the restaurant, other agents entered the apartment with a key furnished by Kennedy, took the briefcase to a locksmith who made a key for it, opened the briefcase and photographed documents in it that led to evidence used to convict Payner. Payner, of course, did not have standing to object to the search. The district court found that the United States "knowingly and willfully participated" in the illegal search. Nonetheless, the Supreme Court refused to affirm the use of the courts' supervisory power to suppress the evidence. It agreed with a government argument that even though the evidence was tainted with gross illegalities, "such an extension of the supervisory power would enable federal courts to exercise a standardless discretion." *Id.* at 733.

AFFIRMED.