**UNITED STATES of America**

v.

**Ralph E. GOODWIN, Jr. a/k/a Ralph E. Goodwon.**

**Crim. No. 87–00240–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Dec. 7, 1987.

---

9. In a hearing prior to trial, counsel for Peerless stated that remedies against Vitoangelo were being pursued.

James M. Sullivan, Asst. U.S. Atty., Alexandria, Va., for plaintiff.

Frederick Sinclair, Alexandria, Va., for defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

### Introduction

This is an 18 U.S.C. § 2252(a)(2) child pornography prosecution. Defendant concedes the facts. They are stipulated. Only legal defenses are raised. Specifically, in an earlier motion, defendant challenged the anticipatory search warrant that allowed authorities to seize the pornographic material almost contemporaneously with its delivery to defendant. That challenge was turned back.[1]

In this proceeding, defendant first attacks federal jurisdiction, contending that the government illegitimately manufactured the interstate commerce element. But the principal legal defense is a due process attack on the government's conduct leading to defendant's arrest. Neither attack succeeds. Federal jurisdiction validly exists; it is neither manufactured nor illegitimate. The due process attack, though not insubstantial, also ultimately fails. On close inspection, the government's conduct does not violate due process; it does not offend traditional notions of fairness; and it is neither shocking nor disproportionate to the evil at which it is aimed.

The failure of these legal defenses coupled with the stipulated facts, which the court accepts and adopts, compels the court to conclude that the offense charged against the defendant, in all its elements, has been proved beyond a reasonable doubt. It follows that defendant must be and is adjudged guilty as charged in the indictment.

### Facts

Operation Looking Glass, which led to defendant's arrest, was conceived and implemented by the United States Postal Inspection Service to ferret out and prosecute consumers of child pornography. This group is one of the targets of 18 U.S.C. § 2252(a)(2).[2] The perniciousness of child pornography can hardly be exaggerated. Children are horribly victimized and abused to feed a most unwholesome and destructive appetite. To combat this growing scourge,[3] Operation Looking Glass set out

---

1. See United States v. Hale, 784 F.2d 1465 (9th Cir.1986), cert. denied, —— U.S. ——, 107 S.Ct. 110, 93 L.Ed.2d 59 (1986).

2. The statute provides, in pertinent part,
 (a) Any person who—
 \* \* \*
 (2) knowingly receives, or distributes, any visual depiction that has been transported or shipped in interstate or foreign commerce or mailed or knowingly reproduces any visual depiction for distribution in interstate or foreign commerce or through the mails, if—
 (A) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and
 (B) such visual depiction is of such conduct; ....

3. See Comment, Preying on Playgrounds: The Sexploitation of Children for Pornography and Prostitution, 5 Pepperdine L.Rev. 809, 845

to identify those who were predisposed to consume child pornography and who sought to use the United States mails for this purpose. The means chosen was an undercover operation.

The Far Eastern Trading Co., Ltd. of Hong Kong is an undercover child pornography mail order firm established by the Postal Inspection Service to accomplish the purpose of Operation Looking Glass. Hong Kong was chosen with the consent and cooperation of the local government apparently because substantial amounts of child pornography come from overseas. A branch office was located at P.O. Box 3071, Frederiksted, St. Croix, Virgin Islands, 00840, in order, as we shall see, to add to the authenticity of the operation.

The method of operation was simple and effective. In general, various means were used to identify persons, initially at least, as predisposed towards child pornography. Typically, initial identification of targets was accomplished by answering advertisements apparently seeking such material or by the use of lists transmitted by the Customs Service of persons to whom offending material had been sent from overseas and then seized. Subsequent test correspondence was sent to confirm predisposition. Thereafter, the target was sent a catalog and order form. This material, as well as the pornographic materials themselves, was assembled by the government at Operation Looking Glass' facilities in Newark, N.J. All pornographic materials used in the operation were taken from material earlier seized by the authorities. Orders received were filled by sending the material from Newark to Postal Inspector Northrop in Washington, D.C., who in turn placed the material in an envelope with a St. Croix stamp and postmark and then had the postal service deliver the material to the individual. Very shortly thereafter,[4] the individual was visited by the authorities armed with a search warrant. The arrest followed.[5]

In the instant case, the essential facts fit this pattern. Defendant, Ralph E. Goodwin, Jr., first came to the Postal Inspection Service's attention in September, 1983 when he placed the following advertisement in the October issue of the now defunct Met Forum, a Washington area swinger's magazine:[6]

> Wanted: Lollitots, moppets & chicken magazines & photographs. If you have single copies you want to sell, send your telephone number to MP Code 3941.

Test correspondence with the person who placed the ad revealed that it was the defendant, Ralph Goodwin, and that defendant was a "beginner," whose "latent desires" were just then emerging.[7] The September, 1983 test letter received from defendant confirmed his interest in obtaining the types of material described in the ad as well as accounts of personal experiences. He identified himself as a mid-forties, married, white male with four children and employed by a large advertising firm.[8]

While the 1983 ad and resulting correspondence were the first evidences of defendant's predisposition, they were not the last. Mr. Goodwin was also known to the Postal Inspection Service through additional test correspondence. In this correspondence, defendant stated that he spent over $100 a year on hard core pornography usually through the mails or from Europe and that he was interested in teenage and

---

(1978) (sexploitation of children in pornography "growing at an alarming rate").

**4.** Special care was apparently taken to minimize the time interval between the delivery and the search to insure that the material was not copied or further disseminated.

**5.** It appears that more than a dozen persons have been arrested in the Eastern District of Virginia as a result of Operation Looking Glass.

**6.** Self described and subtitled "Washington Baltimore's Most Complete Adult Guide."

**7.** See Exhibit 8. In his typewritten response to the test letter, defendant thanked the sender for answering his ad in the Met Forum and explained that he was "more than ever interested in seeing and possibly obtaining some books and magazines, and [was] especially curious about the 'personal experiences' you mentioned." Defendant emphasized the need for discretion and caution.

**8.** The self description is accurate in all respects except age. His age is 54.

pre-teenage sexual activity involving both heterosexual and homosexual activity.

Defendant's contact with Operation Looking Glass leading to his arrest and indictment commenced in March, 1987. Based on substantial previous evidence of predisposition, the Far Eastern Trading Company sent him a solicitation letter on March 20, 1987. The letter, on Hong Kong stationery, was enclosed in an envelope on which defendant's name was incorrectly spelled as "Goodwon". This solicitation letter plainly focused on child pornography. It stated:

As many of you know, much hysterical nonsense has appeared in the American media concerning "pornography" and what must be done to stop it from coming across your borders. This brief letter does not allow us to give much comments; however, why is your government spending millions of dollars to exercise international censorship while tons of drugs, which makes yours the world's most crime ridden country are passed through easily. We have read the comments of Mr. Van Rabb of your Customs Service concerning the efforts of his agents to find "children's pornography" and we find that many of you are denied a product because of that agency. After conversation with enlightened Americans, we have found that if material is given to your post without a Custom inspection, a search warrant must be gotten in order to open your mail.

For those of you who have enjoyed youthful material from publishers such as COQ, Color Climax, Rodox and others, we have devised a method of getting these to you without prying eyes of U.S. Customs seizing your mail. All material that you order from your company will be sent to you through our branch office in the Virgin Islands. After consultations with American solicitors, we have been advised that once we have posted our material through your system, it cannot be opened for any inspection without authorization of a judge.

The letter included a response coupon, which defendant filled out requesting further information. He also signed a disclaimer on the response coupon, promising that he was not an undercover law enforcement agent. The disclaimer added authenticity to the letter. Defendant mailed the completed response form to the St. Croix address, where it was forwarded unopened to Inspector Northrop in Washington, D.C. Northrop opened the letter on April 30, 1987.

In response to defendant's request for more information, a mailing containing a catalog of available mail order child pornography material was sent to defendant by the Far Eastern Trading Company, with United States postage affixed and a Virgin Islands postmark. The catalog provided detailed descriptions of seven video tapes, two 8mm films and seven magazines, all dealing with child pornography. Each item was generally described as consisting of visual depictions of minors engaged in sexually explicit conduct. Two letters were also included in the mailing. One informed defendant of the procedures to follow in ordering material, while the second provided information to those who wished to sell child pornography to Far Eastern Trading Company.

Defendant responded by placing an order. On May 14, 1987, a letter from defendant was received at Far Eastern's Virgin Islands post office box. The letter bore a May 3, 1987, northern Virginia postmark and was forwarded to Inspector Northrop in Washington who opened it on May 15, 1987. The letter contained an order from defendant for four magazines advertised in the catalog together with a check for $80.00 signed by defendant and drawn on the business account of Business Promotions, Inc. at First Virginia Bank, Falls Church, Virginia. The letter requested that the material be sent to 10208 Tamarack Drive, Vienna, Virginia 22180, defendant's home address. The four magazines defendant ordered, *Torrid Tots, Lolita Sex, Children Love,* and *Boys Who Love Boys* all were advertised as depicting chil-

dren in sexually explicit situations.[9] It is stipulated, and the court agrees, that each magazine contains visual depictions of sexually explicit conduct involving individuals under the age of 18 years as defined in 18 U.S.C. § 2256.[10]

Far Eastern, through its Newark, N.J. office, responded to defendant's order by preparing two of the magazines, *Children Love* and *Boys Who Love Boys*, for mailing. The magazines were prepared under controlled circumstances from material previously seized or purchased during Postal Inspection Service investigations. The material defendant ordered was then sent from Newark to Inspector Northrop in Washington who in turn had the material delivered to defendant at his home by the United States Postal Service on June 10, 1987. The envelope was sealed, stamped and postmarked at the time of its delivery, which occurred at approximately 1:00 p.m. on June 10, 1987 and which was observed by postal inspectors. Thereafter, at about 4:00 p.m., postal inspectors executed a search warrant at defendant's residence and recovered, *inter alia*, correspondence

to and from Far Eastern Trading Company, a typewriter used by defendant to type letters to Far Eastern, and the two child pornography magazines delivered to defendant earlier in the day. Also recovered were a large volume of nudist and sexually explicit material depicting children as well as adults.[11] Without doubt, this defendant was a consumer of child pornography, predisposed to continue to do so in violation of the law.

At the time of the search and prior to the arrest, defendant admitted ordering the two child pornography magazines sent by Far Eastern and seized in the search. Defendant was thereafter arrested and indicted and the trial followed.

### Analysis

#### A. *The Offense*

■ The stipulated facts establish beyond a reasonable doubt each of the elements of the charged offense. Defendant received in the mail, at his request, materials he knew would be and are statutorily proscribed child pornography.[12] He has es-

---

9. The catalog descriptions were as follows:

TORRID TOTS: Very young girls. Some as young as 5 years old in all kinds of seductive poses. Hard to get material. Sucking and fucking. Black and White. No. MTT 01—$10.00 US.

LOLITA—SEX: More pissing and masturbation from producers of the Lolita series of magazines. Girls 8 years up to 15 years in hard core action. Exciting intercourse and cum shots. No. MLS 04–$20.00 US.

CHILDREN–LOVE: Girls and boys from 4 years to 15 years in group sex orgies with adults. Outstanding oral sex performance by 9 year old girl on her dad. No MLS 05–$25.00 US.

BOYS WHO LOVE BOYS: 11 year old and 14 year old boys get it on in every way possible. Oral, anal sex and heavy masturbation. If you love boys, you will be delighted with this. No. MDS 06—$25.00 US.

10. It was also stipulated that all material offered for sale by Far Eastern Trading Co., including the magazines ordered by defendant, have been reviewed by a pediatrician whose experience is in adolescent development. This pediatrician reviewed the material and concluded that the children depicted in the sexually explicit activity are under 18 years of age.

11. Government Exhibits 45 and 47 clearly show defendant's predisposition to seek and obtain child pornography. Exhibit 45 consists of three

magazines—*Chicken Pickens, Oh Boy* and *101 Boys*. The magazine *Chicken Pickens* contains photographs of teenage and pre-teenage nude boys in lascivious poses, individually and in groups. In many of the pictures, the boys' genitalia are erect. Many of the photographs also depict boys performing masturbation on themselves or on other boys. In several of the pictures, young children are shown touching the genitals of older males. *Oh Boys* contains many photographs of nude pre-teenage boys in various poses. *101 Boys*, while not depicting frontal nudity, shows pre-teenage and teenage boys in various stages of undress.

Three magazines are contained in Exhibit 47. *Teenage Nudist* depicts naked young people in groups engaged in athletic activities. *Nudist Moppetts* contains photographs of very young and pre-teenage nude boys and girls. Several pictures show young girls in lascivious poses. Finally, *Lollitots* features explicit depictions of the genitalia of very young and pre-teenage girls.

12. Sexually explicit material depicting only adults is entitled to First Amendment protection unless it is held to be obscene under the tests announced in *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) and *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). By contrast, child pornography may be proscribed without regard to

sentially admitted that he was predisposed to consume such material, that he ordered it through the mails fully aware of its nature and that he received it. Guilt under the statute cannot be seriously disputed.

### B. *Jurisdiction*

 Defendant claims that the statute's jurisdictional requirement is not met because the mailing and interstate commerce nexus were manufactured by the government. *United States v. Archer*, 486 F.2d 670 (2d Cir.1973), is the sole support cited. It is, however, distinguishable and cannot bear the weight of defendant's argument. *Archer* was a Travel Act, 18 U.S.C. § 1952, prosecution growing out of an intensive local and federal undercover investigation of corruption in New York City's criminal justice system. Ultimately, the principal issue was whether three telephone calls were sufficient to trigger the Act. The court concluded they were not, noting that

> Whatever Congress may have meant by Section 1952(a)(3), it certainly did not intend to include a telephone call manufactured by the government for the precise purpose of transforming *a local bribery offense into a federal crime.*

486 F.2d at 681 (emphasis added). In that court's view the undercover scheme "needlessly injected the federal government in a matter of state concern." *Id.* at 672. That court also distinguished *United States v. Edwards*, 366 F.2d 853 (2d Cir.1966), *cert. denied*, 386 U.S. 908, 87 S.Ct. 852, 17 L.Ed. 2d 782 (1967), by noting that the participants in *Edwards* never considered themselves limited by New York boundaries. So, too, the defendant here never considered himself limited to Virginia's bound-

aries in his search for child pornography. He advertised in a magazine, obviously inviting responses from any state the magazine might reach. He responded by mail to Far Eastern's out of state mailings and used the U.S. mail to order the offending material he knew would be delivered by the U.S. mail. Far Eastern was established in Hong Kong and the Virgin Islands for reasons wholly unrelated to jurisdiction; it was done to add authenticity to the venture. Unlike *Archer*, therefore, Far Eastern's foreign venture was not chosen to manufacture jurisdiction or as an attempt to transform an essentially local matter into a federal crime. Moreover, unlike the Travel Act, the federal statute proscribing the receipt of child pornography is satisfied if the material is received in the U.S. mail even if mailed intrastate.[13] In sum, defendant's reliance on *Archer* is misplaced and the facts amply confirm the existence here of jurisdiction under Section 2252(a)(2).

### C. *The Due Process Attack*

Claims that the authorities bent on fighting crime have overstepped due process grounds should not be taken lightly by courts. To be sure, crime in all its manifestations is a constant societal threat and authorities must be zealous in ferreting out and prosecuting criminals. But on occasion, authorities can be (and have been)[14] overzealous, abusing their enormous power. When this occurs, individual rights fall victim and courts are often the only recourse, the only source of a remedy. So it is that this court and all courts should give careful scrutiny to claims of this sort.

The starting point for a due process analysis of government conduct in an inves-

---

whether it meets the *Miller–Roth* tests; child pornography may be banned whether or not legally obscene. *See New York v. Ferber*, 458 U.S. 747, 764, 102 S.Ct. 3348, 3358, 73 L.Ed.2d 1113 (1982). Thus, Operation Looking Glass may be appropriate for child pornography, but not for material depicting solely adults.

**13.** Nor is it of any consequence that the material was mailed by the government. *See Goode v. United States*, 159 U.S. 663, 669, 16 S.Ct. 136, 40 L.Ed. 297 (1895) (it is no defense to mail theft that the letter was a decoy); *United States v. Jones*, 80 F. 513, 514 (C.C.E.D.Va.1897) (same).

**14.** *See, e.g., United States v. Twigg*, 588 F.2d 373, 380–81 (3d Cir.1978) (government involvement in crime so extensive and outrageous as to bar prosecution). In *United States v. Archer*, 486 F.2d 670 (2d Cir.1973), the court dismissed the indictment on jurisdictional grounds, but made unmistakably clear its disapproval of the undercover tactics there employed which, as the court noted, involved agents bribing state authorities, lying to police officers and committing perjury in court. *Id.* at 672.

tigation must be *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976). There, defendant was convicted of selling heroin which, as it turned out, was supplied to him by a government informant and sold by him to undercover agents. Conceding that his predisposition to sell heroin precluded an entrapment defense,[15] defendant nonetheless challenged the conviction on the ground that the government's outrageous conduct in supplying him with contraband denied him due process. He relied on *dicta* in *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973), to the effect that

> [W]e may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, *cf. Rochin v. California*, 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183] (1952), ....

A divided Court rejected the *Hampton* defendant's claim. A plurality held that the due process clause cannot be invoked to overturn a conviction on grounds of governmental misconduct absent a violation of a protected right of the defendant. Chief Justice Rehnquist, the author of the plurality opinion, took an even more restrictive view. He indicated that "the remedy ... with respect to acts of government authorities ... lies solely in the defense of entrapment." 425 U.S. at 490, 96 S.Ct. at 1650.

A close reading of all the *Hampton* opinions, however, strongly suggests that a majority of the justices would hold that a due process defense survives *Hampton* and is available in appropriate circumstances. Several post-*Hampton* courts have so held[16] and the Fourth Circuit, while not directly deciding the issue, has certainly not foreclosed it.[17] This court concludes that *Hampton*, properly read, and taken together with *Russell*, leaves open that there may be some circumstances in which government conduct is so offensive that a conviction should be set aside on due process grounds. The question then is whether these circumstances, namely the establishment and conduct of Operation Looking Glass, are such as to warrant this extraordinary constitutional remedy.

■ From the decisions, and on principle, it is clear that due process violations exist only where the official conduct is not merely offensive, but outrageous. Government conduct does not reach this level simply because it is undercover or a reverse sting or because the government supplies an ingredient or even the contraband itself.[18] Government conduct must go beyond this to require reversal of a conviction or dismissal of the indictment.

■ Not surprisingly, therefore, in only two appellate decisions have courts found government conduct to be outrageous enough to warrant reversal of a conviction. In *United States v. Twigg*, 588 F.2d 373 (1978), the Third Circuit reversed convictions of two defendants for "speed" manufacturing. Government agents and informers conceived and contrived the entire offense; they persuaded those defendants to operate a speed production laboratory and then proceeded to furnish virtually all of

---

**15.** *See, e.g., United States v. Russell*, 411 U.S. 423, 433, 436, 93 S.Ct. 1637, 1643, 1645, 36 L.Ed.2d 366 (1973) (predisposition forecloses entrapment defense).

**16.** *See e.g., United States v. Gamble*, 737 F.2d 853 (10th Cir.1984); *United States v. Twigg*, 588 F.2d 373 (3d Cir.1978). Interestingly, the Pretrial Memorandum of the United States, dated November 17, 1987, at page 1, essentially concedes that *Hampton* permits due process attacks on allegedly "outrageous" conduct on the part of law enforcement agents.

**17.** *See United States v. Akinseye*, 802 F.2d 740, 743 n. 2 (4th Cir.1986) (even assuming the existence of a due process defense, the government's behavior did not rise to the level of a violation),

*cert. denied,* —— U.S. ——, 107 S.Ct. 3190, 96 L.Ed.2d 678 (1987); *United States v. Hunt,* 749 F.2d 1078, 1087 (4th Cir.1984) (same), *cert. denied,* 472 U.S. 1018, 105 S.Ct. 3479, 87 L.Ed.2d 614 (1985).

**18.** *See Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976) (due process not violated where government supplies the heroin defendant sells); *see also United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973) (due process apparently not violated where government agent supplied defendant with a necessary ingredient to manufacture an illicit drug).

the requisite machinery, apparatus, know-how and chemicals, and the isolated farm-house location as well. As the court recognized, neither defendant "knew how to manufacture speed, and each provided only minimal assistance." 588 F.2d at 378. *Greene v. United States*, 454 F.2d 783 (9th Cir.1971), is essentially similar. There it was not an illegal speed factory, but a still. Neither case, however, is analogous to the one at bar. Defendant here was not an unwilling participant induced, persuaded,[19] inveighed or hectored into purchasing illegal child pornography; he was already a consumer of such material looking for opportunities to purchase more. All Operation Looking Glass did was to provide defendant with an opportunity, much as an undercover DEA agent posing as a cocaine seller provides an opportunity to a purchaser of cocaine before making the arrest. This is not government conduct so outrageous as to violate due process.[20]

The due process calculus must take into account the nature of the crime involved.

Conduct appropriate to ferrett out and deter perpetrators of serious crimes may not be appropriate where only a minor crime is involved. Child pornography is unquestionably a serious and pernicious crime.[21] The Government has a compelling, surpassingly important interest in preventing the sexual exploitation and abuse of children who are photographed for the production of such materials. Indeed, this interest has led Congress to provide stiff penalties for consumers as well as producers of the material.[22] The evil targetted by Congress in Section 2252(a)(2) is unquestionably of a nature and gravity sufficient to warrant the authorities to use undercover operations like Operation Looking Glass. Indeed, the Operation is noteworthy for the care taken to confirm a subject's predisposition and for the absence of any repeated inducements or hectoring.[23] From this and because of the existence of quite appropriate limitations on governmental mail surveillance and seizure activities, it is fair to conclude that Operation Looking Glass, far

---

**19.** Defendant here was far from an inactive, passive participant in a criminal venture; he placed an ad seeking child pornography, responded positively to Far Eastern's test letter, signed a certification that he was not an undercover agent thereby highlighting the illegality involved and, finally, ordered and received material he knew depicted children engaged in sexually explicit conduct.

**20.** For purposes of this opinion it is not necessary to draw a precise line between permitted and unpermitted official investigative conduct. It is enough to note that Operation Looking Glass involved official conduct no more offensive than the typical undercover drug operation. Also worth noting is that courts have refused to void convictions in cases involving conduct this court considers closer to the line than Operation Looking Glass. In *United States v. Archer*, 486 F.2d 670 (1973), the Second Circuit noted with disapproval that the undercover conduct there involved bribery of state officials, lying to police and perjury in court *Id.* at 677. Ultimately, however, the court found no due process violation. *Archer v. Commissioner of Correction*, 646 F.2d 44, 47 (2d Cir.1981) (habeas corpus review), *cert. denied*, 454 U.S. 851, 102 S.Ct. 291, 70 L.Ed.2d 141 (1981). *United States v. Gamble*, 737 F.2d 853 (10th Cir.1984), is essentially similar. In both cases the courts focused on the fact that the allegedly impermissible conduct was not inflicted directly on the defendant.

**21.** Evidence of the seriousness of this crime is found in House Report No. 99–910 which rec-

ommended passage of certain amendments titled Child Sexual Abuse and Pornography Act of 1986. It stated as follows:

Of all the crimes known to our society, perhaps none is more revolting than the sexual exploitation of children, particularly for the purpose of producing child pornography.

1986 U.S.Code Cong. & Admin.News 5952, 5953. *See also* Congressional findings in support of the 1986 Amendments set forth in the legislative history summary in 18 U.S.C.A. § 2251 (West Supp.1987).

**22.** Section 2252(b) provides for a term of imprisonment of up to 10 years and a fine of up to $10,000, or both. Recidivists under the statute must be imprisoned for at least two years but not more than 15 years and the potential fine is increased to $200,000.

Consumers of child pornography are also viewed sympathetically by some as less than willing victims of their unwholesome appetites. Whatever the validity of this observation, it is irrelevant to the issue of guilt or innocence or to the due process calculus; it is relevant, if at all to the punishment phase.

**23.** In *United States v. Hunt*, 749 F.2d 1078 (1984), the Fourth Circuit rejected a due process claim concerning a government undercover operation designed to uncover corruption on the part of a local judge. That defendant specifically complained of the government's "persistence ... in pursuing him," and even so, the court

from violative of due process, is well tailored to achieve the congressional purpose embodied in § 2252(a)(2).[24] As applied with respect to this defendant, the Operation was neither shocking, nor offensive to traditional notions of fundamental fairness. Accordingly, this court holds that Operation Looking Glass does not violate due process as applied in this case. To hold otherwise would call into constitutional question even the most routine and now well-accepted sting or undercover investigative techniques.[25] In reaching this conclusion, however, the court makes clear its view that official conduct can cross the line into unconstitutional territory, but it intimates no view or opinion on what such conduct might be or on whether variations of Operation Looking Glass might fail constitutional muster.

held that the government's conduct was within bounds. In this connection, Judge Russell noted,

> Nor are we presented with a situation where a defendant firmly refused a proposed payoff, and thereafter was incessantly hectored by government agents to reverse his decision; such a situation, indeed, might be equally well resolved on entrapment grounds as due process.

*Id.* at 1087.

**24.** *See* 1978 U.S.Code Cong. & Admin.News 40. Significant here is the recognition in the legislative history that "the production, distribution and sale of child pornography is often a clandestine operation." Id. at 43. *See also United States v. Langford,* 688 F.2d 1088, 1097 (7th Cir.1982) ("Congress clearly intended that § 2251 *et seq.* eradicate the entire commercial chain involved in the production, distribution and sale of child pornography"), *cert. denied,* 461 U.S. 959, 103 S.Ct. 2433, 77 L.Ed.2d 1319 (1983).

**25.** A measure of government illegality is now a well-accepted weapon in the war against crime. It was not always so clear and it is worth recalling the views of two of our most eminent jurists on this issue, for the principle they enunciate, while not the law, is nonetheless a powerful reminder that there are and should be judicially enforced due process limits on government conduct in fighting crime. Justice Brandeis, dissenting in *Olmstead v. United States,* 277

U.S. 438, 472, 48 S.Ct. 564, 570, 72 L.Ed. 944 (1928), put the point with characteristic eloquence:

> Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face.

Justice Holmes, in the same case, put the point more simply and succinctly:

> We have to choose, and for my part, I think it a lesser evil that some criminals should escape than that the government should play an ignoble part.

*Id.* at 470, 48 S.Ct. at 575; *see also Casey v. United States,* 276 U.S. 413, 423–25, 48 S.Ct. 373, 376, 72 L.Ed. 632 (1927) (Brandeis, J., dissenting).